**EVANGELICAL LUTHERAN GOOD SA-
MARITAN SOCIETY, a nonprofit cor-
poration, Plaintiff and Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS,
RAMSEY COUNTY, North Dakota, and
Byron L. Dorgan, North Dakota State Tax
Commissioner, Defendants and Appellants.**

Civ. No. 8984.

Supreme Court of North Dakota.

June 28, 1974.

Kenneth M. Jakes, Special Asst. Atty. Gen., State Tax Dept., Bismarck, Neil Thompson, State's Atty., Devils Lake, for defendants and appellants.

Vogel, Vogel, Brantner & Kelly, Fargo, and Hackler, Londerholm, Speer, Vader & Austin, Olathe, Kan., for plaintiff and appellee.

PAULSON, Judge.

This is a joint appeal by the Board of County Commissioners of Ramsey County

[hereinafter "the County Commissioners"] and the North Dakota State Tax Commissioner [hereinafter "the Tax Commissioner"] from a judgment of the Ramsey County District Court which held that certain real property which is located in Devils Lake owned by the Evangelical Lutheran Good Samaritan Society [hereinafter "the Society"] is entitled to tax exemption.

The real property in question is situated at 302 7th Avenue in Devils Lake, in Ramsey County. Located on this property is a former hospital building that was purchased by the Society in 1954, to which additions were made in 1969 and 1972, and on which premises the Society has operated a home for the aged and infirm since 1954. For the tax year 1972, the Society was licensed by the Social Service Board of North Dakota to operate a home for the aged and infirm on such premises, pursuant to Chapter 50–18 of the North Dakota Century Code.

The Society was organized and incorporated in 1922 in North Dakota as a nonprofit and religious corporation. Beginning in 1922 with the operation of a rented house in Arthur, North Dakota, to take care of handicapped people, the Society, as of May of 1973, has expanded its operations into 20 States, where it owns and operates 160 separate institutions in which it provides various services. These institutions are predominantly nursing homes and homes for the aged, but also include 3 hospitals, 2 homes for mentally retarded adults, and 10 homes for delinquent boys. Eleven of these facilities are located in North Dakota.

The Society has no stockholders. No individual can receive any profit from the institutions owned or operated by it except for salary received as an employee. The Society's constitution provides that if the Society were dissolved, the assets of the Devils Lake Home would be conveyed to a local nonprofit charitable organization.

The Devils Lake Home of the Society is licensed to accommodate 90 persons. In May of 1973, 83 of the 90 beds were occupied, and 5 of the 7 remaining beds would not be occupied because 5 residents were each paying for 2 beds in order to have private rooms. Of the remaining unoccupied 2 beds, one was reserved for an applicant who was in the process of being admitted to the Home; and the other bed was kept available for emergency use. The Home had a waiting list of about 30 applicants for admission, in May of 1973.

The Devils Lake Home is licensed by the Social Service Board of North Dakota for three levels of care. These levels of care do not include skilled nursing care, which level of care requires registered nurses to be in attendance. The Home does not employ registered nurses but does employ 6 licensed practical nurses and 11 nurse's aides. It also operates a drug room. Care includes dispensing medications, giving therapy treatments, taking blood pressures, and keeping a medical chart for each resident, in addition to providing for the daily needs of the residents.

Of the 83 residents of the Home, 6 are blind, 23 require wheelchairs, 6 are diabetics, 28 are mentally ill, and 4 are retarded. Most of the mentally ill or retarded patients were formerly patients in State institutions at Jamestown and Grafton, prior to their admission to the Devils Lake Home. The average age of all the residents is about 70 or 71, and all of them need care and supervision. Persons from the Devils Lake area are given preference for admission to the Home.

The Devils Lake Home employs a full-time activities director who is responsible for providing social activities and crafts for the residents of the Home. Church circles and organizations, senior citizens' groups, and other volunteer groups assist in providing these services. There is a Christian, religious emphasis throughout the administration of the Society's work that is directed to staff members, other employees, and the residents of the various Homes. As to the corporate headquarters of the Society in Sioux Falls, South Dako-

ta, all board members must be Lutherans and all central office administrative personnel must be Lutherans. All but about 20 percent of the administrators of the various Homes or institutions of the Society are Lutherans; the non-Lutherans must be active members of a Christian church. The executive director of the Society is an ordained Lutheran minister, as are most of the staff members at the central office. There are other ordained ministers who are administrators throughout the Society.

The Society itself is not an organic part of any church body or controlled or under the express direction of any church body.

At the Devils Lake Home, religious services are conducted every Sunday, and Bible study every Wednesday. There is prayer conducted at every meal and devotions are held every morning. Efforts are made to involve the residents and staff. No preference on a religious basis, Lutheran or otherwise, is given in admitting applicants for residence at the Home.

As to the financial aspects of operating the Devils Lake Home, 64 percent of the residents are welfare recipients. The average daily cost incurred by the Home for each resident, both welfare and non-welfare recipient, exceeds the average daily payment received by the Home for each welfare patient. The cost of caring for all residents at the Devils Lake Home is presumably paid for through the welfare program or by the residents themselves or by relatives or others. There is no evidence that the Devils Lake Home provides care for any resident on a "free" basis, although the evidence does show that other Homes operated by the Society in North Dakota currently care for residents on a free basis.

In 1969, the Society's board of directors adopted a resolution reflecting its policy of the past and for the future—that no resident in any institution owned or operated by the Society had been or would be discharged "by reason of deterioration of health or inability to pay the charges of the institution, unless the deterioration of health necessitates removal to an institution where better care can be provided, such as a hospital or mental institution."

Balance sheets for the Devils Lake Home for the 5 calendar years of 1968 through 1972 show that the total equity in the Home on January 1, 1968, of $118,729.-62 had increased by $57,672.25, to a total equity at the end of 1972 of $176,401.87.

The operating statement for the Devils Lake Home shows net income of $9,627.61 in 1968; $11,636.94 in 1969; $15,389.94 in 1970; $16,756.07 in 1971; and $15,243.34 in 1972. None of this net income was forwarded to the Society's central office at Sioux Falls. Instead, the Devils Lake Home used the net income it earned to purchase the land upon which the latest addition to the Home was built, to construct the addition, and to purchase furniture and fixtures therefor.

Dues are paid to the Society's central office by the Devils Lake Home at the rate of $5 per bed per month. These dues are used to help operate the central office in Sioux Falls, which, in turn, provides, among other services, supervision, accounting assistance, program planning, and buying power for the various institutions, including the Devils Lake Home, of the Society.

Personnel employed by the Devils Lake Home are paid at about the same rate as are other persons similarly employed; while the administrators' salaries are below average, with the Society's executive director receiving a salary of $17,100 plus housing, and its board members serving without pay.

The Society has always been recognized by the United States Internal Revenue Service to be exempt from Federal income tax, as an organization described in § 501(c)(3) of the Internal Revenue Code of 1954 as one that is organized and operated exclusively for charitable purposes. For North Dakota income tax purposes, the So-

ciety annually files the affidavit that is required by § 57–38–09.1, North Dakota Century Code, from organizations exempt from tax, and in which affidavit the Society claims exemption as a religious and charitable nonprofit corporation, pursuant to subsection 8 of § 57–38–09, N.D.C.C. The Society had not been assessed and taxed on its Devils Lake Home property prior to 1972.

In 1972, the real property in question was placed on the assessment rolls at an assessed value of $64,302. The Society, on October 2, 1972, filed an application for abatement and settlement of taxes with the auditor of Ramsey County, pursuant to Chapter 57–23, N.D.C.C., in which application the Society claimed total exemption of the property and prayed that the taxes on it be abated and that the property be exempt from taxation under subsection 8 of § 57–02–08, N.D.C.C.

The Society's application for abatement and settlement of taxes was referred to the Devils Lake City Commission for its recommendation, pursuant to § 57–23–06, N.D.C.C., and, on October 31, 1972, that body recommended that such application be denied. The application was then heard and considered by the Ramsey County Commissioners, as provided in § 57–23–06, N.D.C.C., and was denied on February 6, 1973.

On February 15, 1973, the Society appealed the decision of the County Commissioners to the Ramsey County District Court, as authorized by §§ 57–23–08, 11–11–39, and 11–11–41, N.D.C.C. The district court heard the appeal on May 23, 1973, and on August 15, 1973, the court issued its findings of fact, conclusions of law, order for judgment, and judgment, reversing the decision of the County Commissioners and holding that the property in question was exempt from taxation pursuant to § 176 of the North Dakota Constitution and subsection 8 of § 57–02–08, N.D.C.C.

Section 176 of the North Dakota Constitution, in pertinent part, provides:

". . . property used exclusively for schools, religious, cemetery, charitable or other public purposes shall be exempt from taxation. . . ."

Section 176 of the North Dakota Constitution is a mandate to exempt from taxation property used exclusively for charitable purposes. In order to implement this constitutional command, the North Dakota Legislature enacted subsection 8 of § 57–02–08, N.D.C.C., which provides:

"*57–02–08. Property exempt from taxation.*—All property described in this section to the extent herein limited shall be exempt from taxation, that is to say:

. . . . . .

"8. All buildings and contents thereof belonging to institutions of public charity, including public hospitals *and nursing homes licensed pursuant to section 23–16–01* under the control of religious or charitable institutions, used wholly or in part for public charity, together with the land actually occupied by such institutions not leased or otherwise used with a view to profit, and all moneys and credits appropriated solely to sustaining and belonging exclusively to such institutions;" [Emphasized portion is 1973 amendment which was not law at the time the instant case arose.]

■ In 51 Am.Jur., Taxation § 600, at page 583, it is stated:

"When the statutes grant charitable institutions exemptions from taxation, the determination of the exemption in a particular case depends upon whether the organization claiming the exemption is in fact a charitable one, and whether the property on which the exemption is claimed is being devoted to charitable purposes."

In answering these questions, we will follow the guidelines previously adopted by this court for use in determining whether property falls within the tax exemption statutes.

In North Dakota Soc. for Crippled Child. & Ad. v. Murphy, 94 N.W.2d 343 (N.D.1959), this court determined that, although the North Dakota Society for Crippled Children and Adults was a charitable institution, because the use by it of property solely for the purpose of providing a residence for such Society's executive director did not result in a direct and primary benefit to the public charitable activities of such Society, the property was not tax exempt. In paragraph 3 of the syllabus this court held:

"In order to warrant the exemption from taxation of property under the provisions of Section 57–0208, paragraph 8, NDRC 1943 as being 'used wholly or in part for public charity' its use must result in a benefit that has at least some direct and primary connection with the public charitable activities of the institution. A monetary saving or a mere convenience is not such a benefit."

In 1970, in Lutheran Camp. Coun. v. Board of Co. Com'rs, Ward Co., 174 N.W. 2d 362 (N.D.1970), this court determined that property which was owned by the Lutheran Campus Council and used by its minister for religious group meetings and counseling of students and faculty members, as well as for an office and residence, was tax exempt. In order to reach that result we adopted, Lutheran Camp. Coun., *supra* 174 N.W.2d at 365–366, the approach to the problem of determining the breadth of tax exemption statutes stated by the Nebraska Supreme Court in Lincoln Woman's Club v. City of Lincoln, 178 Neb. 357, 133 N.W.2d 455, 459 (1965), as follows:

"It is well settled that provisions exempting property from taxation are to be strictly construed; that their operation should not be extended by construction; and that the power and right of the state to tax are presumed and the exemption must be clearly granted. This does not mean that there should not be a liberal construction of the language used in or-

der to carry out the expressed intention of the fundamental lawmakers and the Legislature but, rather, that the property which is claimed to be exempt must come clearly within the provisions granting such exemption. [Citation omitted.]

"The theory that the rule requiring strict construction of a tax exemption statute demands that the narrowest possible meaning should be given to words descriptive of the objects of it would establish too severe a standard. A liberal and not a harsh or strained construction is to be given to the terms 'educational,' 'religious,' and 'charitable' in order that the true intent of the constitutional and statutory provisions may be realized. The judicial interpretation of such statute should always be reasonable."

In Lutheran Camp. Coun., *supra* 174 N.W.2d at 363, in paragraph 1 of the syllabus, we held:

"It is well settled that provisions exempting property from taxation are to be strictly construed; that their operation should not be extended by construction; and that the power and right of the state to tax are presumed and the exemption must be clearly granted. This does not mean that there should not be a liberal construction of the language used in order to carry out the expressed intention of the fundamental lawmakers and the Legislature but, rather, that the property which is claimed to be exempt must come clearly within the provisions granting such exemption."

In 1972, in Y. M. C. A. of N. D. State Univ. v. Board of County Com'rs, 198 N.W.2d 241 (N.D.1972), we determined that certain property upon which two apartment buildings were located, which apartment buildings were owned and operated by the YMCA, was not tax exempt because, although the YMCA was a charitable organization, the property was not devoted to charitable purposes. In *Y.*

*M.C.A.,* we held in paragraphs 1, 2, 3, and 4 of the syllabus:

"1. The burden of establishing that certain of its property comes within the tax-exemption statutes of the State is upon the one who claims such exemption.

"2. Mere ownership of property by a charitable institution does not of itself exempt the property from taxation. The property claimed to be exempt must be devoted to charitable purposes and must actually be used in carrying out the charitable purposes of the institution claiming exemption.

"3. Statutory provisions exempting property from taxation must be strictly construed, and the statutory exemption must be clearly granted. This does not mean, however, that a liberal construction should not be given to tax-exemption statutes in order to carry out the express intention of the Legislature.

"4. In order to justify the exemption of property from taxation, its use must result in a benefit directly connected with the public charitable activities of the institution claiming exemption."

■■ The use of property for the care of the aged is generally recognized as a charitable use. In Fredericka Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P.2d 68, 70 (1950), the Supreme Court of California summarized the modern view concerning homes for the aged as charitable institutions, as follows:

"The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.'"

Nevertheless, the County Commissioners and the Tax Commissioner contend that the instant case presents a factual situation where a Home which supplies care and attention to the aged is not a charitable organization, and they state the issue presented by the instant case as follows:

Is property that is owned by a nonprofit corporation organized for religious, charitable and benevolent purposes and used by it directly in carrying out those purposes exempt from taxation if that property is operated at an annual net profit and an annual increase in equity in the property because of the charges it makes to the persons it serves, none of whom are provided any free services by the nonprofit corporation?

■ This issue can be broken down into two questions: First: does the fact that the Devils Lake Home operates at a net annual profit and an annual increase in equity deprive that Home of its charitable character? and, second: does the fact that the Devils Lake Home charges fees to the persons it serves, and does not provide any free services to such persons, deprive the Home of its charitable character?

First, let us discuss the fact that the Devils Lake Home operates at a profit. Under the articles of incorporation of the Society, no individual can receive any profit from the Devils Lake Home except for salary received as an employee. All of the profit that the Devils Lake Home earns is reinvested in the Home and the only amount which goes out of the Devils Lake community is a small monthly dues charge made by the Society's central office for the supervisory assistance that it provides to the Home. In addition, the Society's constitution provides that if the Society is dissolved, the assets of the Devils Lake Home would be conveyed to a local nonprofit charitable organization.

The County Commissioners and the Tax Commissioner rely on our recent holding in *Y.M.C.A., supra,* as the basis for their contention that, because the Devils Lake Home operates at a profit, it loses its charitable character. As we noted earlier, *Y.*

M.C.A. dealt with a situation where a charitable organization was operating property owned by it for a profit. However, the fact that distinguishes Y.M.C.A. from the instant case is that, in Y.M.C.A., the property was not devoted to charitable purposes. In Y.M.C.A., supra, 198 N.W.2d at 242, we held, in paragraph 2 of the syllabus:

"Mere ownership of property by a charitable institution does not of itself exempt the property from taxation. The property claimed to be exempt must be devoted to charitable purposes and must actually be used in carrying out the charitable purposes of the institution claiming exemption."

In the instant case, the County Commissioners and the Tax Commissioner do not deny that the Devils Lake Home is being devoted to the charitable purpose for which it was established, that is, the care of the aged and infirm. Instead, they rely primarily on the fact that, in carrying out such charitable purpose, the Home earns a profit.

In Milwaukee Protestant Home v. City of Milwaukee, 41 Wis.2d 284, 164 N.W.2d 289 (1969), the Supreme Court of Wisconsin stated:

"A benevolent association is not required to use only red ink in keeping its books and ledgers."

In Duncan v. Steeper, 17 Wis.2d 226, 116 N.W.2d 154, 159 (1961), the Wisconsin Supreme Court said:

"To deny an otherwise qualifying institution charitable status because it is efficiently organized and managed, so as to operate in the black, would be not only illogical but also extremely detrimental to the incentive for sound management in such institutions."

In 1941, in Order of Sisters of St. Joseph v. Town of Plover, 239 Wis. 278, 1 N.W.2d 173, 175, the Wisconsin Supreme Court said:

"The respondent's claim is to the effect that the River Pines Sanatorium should be taxed on the ground that it aims to operate at a profit. . . . all benevolent institutions endeavor so to operate. But as the profit made by these institutions if any is payable to nobody, but is only turned back into improving facilities or extending the benevolence in which the institutions are primarily engaged, the profit element becomes immaterial."

Other courts as well have recognized that the charitable character of an organization is not destroyed when that organization earns a profit while devoting its property entirely to charitable uses. In a recent decision involving the Society, the Oregon Tax Court held that the fact that the Society earns a profit does not destroy its charitable character. The Oregon Tax Court said, in Ev. Lutheran Good Samaritan Society v. Department of Revenue, State of Oregon, 5 O.T.R. Advance Sheet 14 (Ore.1972), No. 607, February 10, 1972:

"In the present instance, the court has no difficulty in finding for the plaintiff that its net income of $1,000,000 does not derogate from its nonprofit status; in a very large operation, this amount, which includes contributions and some taxable income, merely reflects that 'financial sagacity' approved in Gregory v. Salem General Hospital, 175 Or. 464, 469–470, 153 P.2d 837 (1944). ('* * * It is true that charity is not administered in the defendant's hospital with a free hand; but charity does not lose its character as such when it becomes sagacious. * * *') No profit inures to any member of the corporation."

We agree with the statements of the Wisconsin Supreme Court and that of the Oregon Tax Court and, while there is a conflict on this question, we believe that these statements set forth the better reasoned view. Mr. Justice Harris of the Iowa Supreme Court expressed the rationale behind this view in his dissenting opin-

ion in Evangelical Luth. G. S. Soc. v. Board of Rev., Des Moines, 200 N.W.2d 509, 513 (Iowa 1972), wherein he stated:

"In order to support a claim of tax exemption it should not be required of the claimant to profess and demonstrate a Franciscan indifference toward the property of the charitable operation. Neither should fiscal ignorance or irresponsibility be a necessary element. Efficiency in a charitable operation and the accumulation of the funds and properties have only to do with how successfully the enterprise is conducted. Success in the operation will make it possible to extend the services to more persons. This fosters the purpose and justification for all charitable exemptions which is to make it possible for charities to provide services which otherwise would have to be provided by the government at public expense. I agree with the holding of the Nebraska Supreme Court on exactly the same question in Evangelical Lutheran Good Samaritan Society v. Gage, 181 Neb. 831, 151 N.W.2d 446."

Accordingly, in the instant case, we believe that the Devils Lake Home is not being "used with a view to profit" as that phrase is used in subsection 8 of § 57–02–08, N.D.C.C., because the profit that is earned by the Home is directly and entirely related to the Home's charitable use; and because such profit inures to no private individual but, instead, is reinvested into the Home for upkeep and expansion.

■ Secondly, the County Commissioners and the Tax Commissioner contend that the Devils Lake Home has lost its charitable character by charging fees to the persons it serves and by failing to show that it has provided any free services to such persons. The uncontroverted evidence shows that it has always been the policy of the Society that no person would be refused admittance because of financial inability to pay, and that no person would be removed from a Society Home because

of inability to pay. While the Devils Lake Home has never provided care for a patient for whom it has received no compensation, at the time this litigation arose, 64 percent of the Home's residents were welfare recipients, for each of whom the Home received less than the average daily cost of care for such welfare recipient.

In earlier years, before the advent of modern welfare programs, many persons sought free care from institutions such as those the Society maintains. However, today welfare programs are widespread and a matter of right. The Nebraska Supreme Court recognized this fact in Evangelical Luth. Good Sam. Soc. v. County of Gage, 181 Neb. 831, 151 N.W.2d 446, 449 (1967), where it said:

"Formerly all institutions furnishing services of this nature, including both hospitals and nursing homes, were providing care for many patients without compensation and extended charity in the sense of alms-giving or free services to the poor. With the advent of present day social security and welfare programs, this type of charity is not often found because assistance is available to the poor under these programs."

The Nebraska Supreme Court then quoted with approval, at page 449, of *Gage*, from Young Men's Christian Ass'n of City of Lincoln v. Lancaster County, 106 Neb. 105, 182 N.W. 593, 595 (1921), as follows:

"[Yet,] the courts have defined 'charity' to be something more than mere alms-giving or the relief of poverty and distress, and have given it a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits."

The Nebraska Supreme Court also quoted with approval in *Gage,* at page 450 of 151 N.W.2d, from Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.

W.2d 86, in paragraph 4 of the syllabus, where it is stated, in pertinent part:

"The fact that patients who are able to pay are required to do so does not deprive a corporation of its eleemosynary character . . . ."

*Accord,* Bozeman Deaconess Foundation v. Ford, 151 Mont. 143, 439 P.2d 915, 917 (1968); Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197, 140 N. W.2d 336 (1966).

While there is a conflict on this question, we believe that the better reasoned view in these days of widespread welfare programs in that an institution—which is engaged in the charitable purpose of supplying care and attention to the aged and which institution has always had a policy of supplying this care and attention to all who need its services, regardless of financial ability to pay—does not lose its charitable character because such institutions charges fees to those patients who need its services, or because it has never provided care for a patient on a free basis.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and TEIGEN, VOGEL and KNUDSON, JJ., concur.