RIVERVIEW PLACE, INC., Appellee,

v.

CASS COUNTY, acting By and Through the CASS COUNTY BOARD OF COMMISSIONERS, Appellant.

Civ. No. 890157.

Supreme Court of North Dakota.

Nov. 29, 1989.

J. Gerald Nilles and Daniel J. Crothers (argued), of Nilles, Hansen & Davies, Fargo, for appellee.

Robert G. Hoy, State's Atty., Fargo, for appellant.

Robert W. Wirtz, Asst. Atty. Gen., Office of the State Tax Com'r, Bismarck, for State of N.D., amicus curiae.

Wayne O. Solberg, of Solberg, Stewart, Boulger & Miller, Fargo, for City of Fargo, amicus curiae.

Steven K. Aakre, of Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for American Lutheran Homes, amicus curiae.

VANDE WALLE, Justice.

Cass County appealed from a judgment of the district court which found Riverview Place, Inc., to be an institution of public charity and which abated Riverview Place's real estate taxes for the year 1987. Cass County contends that the trial court erred in finding Riverview Place to be an institution of public charity within the meaning of NDCC § 57-02-08(8). We agree with Cass County, and reverse the judgment of the district court.

Riverview Place is a modern, minimum-care, residential facility for the elderly located in Fargo, North Dakota. It is owned and operated by Riverview Place, Inc., a nonprofit corporation organized in 1986 pursuant to chapter 10-24, NDCC, and whose member-shareholders are the Presentation Sisters of the Blessed Virgin Mary and the Catholic Health Corporation. The purpose of the facility was stated in Riverview Place, Inc.'s articles of incorporation:

"The objects and purposes of this Corporation shall be the owning, organizing and managing of the affairs, property, business and activities of housing and services specially designed to meet the physical, social and psychological needs of the elderly and the promotion of the health, security, happiness and usefulness in longer living of retired persons. As such this Corporation shall be duly benevolent, beneficial, educational, charitable, religious and scientific. Its operation shall be conducted in such a manner as to support the mission of the Roman Catholic Church and shall be operated in compliance with the objectives and philosophy of the Members of this Corporation."

The undisputed facts in the record reveal that Riverview Place is located on property which was donated to Riverview Place, Inc., by the Presentation Sisters. The property was formerly used as a convent by the Presentation Sisters, and had an appraised value of two million dollars at the time of the donation. Upon making the donation of the property, the Presentation Sisters and the Catholic Health Corporation obtained ten million dollars in financing from the sale of Municipal Industrial Development Act bonds [see ch. 40-57, NDCC], and began to develop the property into a modern, apartment-style, living facility for the elderly. A feasibility study was conducted prior to the commencement of construction. The study indicated that the project would be "financially successful, even under the most conservative assumptions." The report estimated start-up losses for the first three years of operation, 1987 through 1989, and indicated that positive cash flows would begin in the fourth operating year. The report projected that Riverview Place would earn a net income of $231,022 in fiscal year 1990, and a net income of $362,807 in the fiscal year ending in 1991. In addition, a consultant's report from an accounting firm forecast similar net income figures after initial losses during the startup years. An agreement between the Presentation Sisters and the Catholic Health Corporation also granted the Catholic Health Corporation an option

to purchase the buildings and land from the Presentation Sisters at specified prices within five years from the start up of operations. Since its inception in 1987, Riverview Place has actually operated with yearly losses which now total more than one million dollars. Moreover, the Catholic Health Corporation has not exercised its option to purchase the buildings and the land.

The facilities at Riverview Place consist of three interconnected, multilevel buildings. As of the assessment date, the three brick-veneered residence buildings provided a total of 95 units available for occupancy, ranging from small one-bedroom apartments to large two-bedroom apartments. All units have interior entrances, carpeting, kitchens with the ordinary appliances, private baths, and a full complement of utilities. Some units have exterior patios, and garages are available for residents.

Occupancy fees at Riverview Place range from between $850 to $1,205 per month. Stated differently, the units rent at an approximate rate of between $1.23 to $1.58 per square foot. A similar apartment in Fargo rents at approximately fifty cents per square foot. The occupancy fee at Riverview Place, however, contains the cost of amenities not typically found in an average apartment complex. As stated in the Occupancy Agreement, these amenities include: a dining room with one meal per day provided to each resident, a shuttle bus, a coffee shop, a chapel, a 24–hour emergency call system, a library, an arts and crafts room, and a greenhouse. For the payment of an additional fee, residents can also acquire such other amenities as housekeeping services, the use of a beauty salon and barber shop, and party catering.

Riverview Place has a number of admission policies. When making an application for residency at Riverview Place, an individual is required a complete a form detailing his or her current financial condition and assets. The Occupancy Agreement signed by the resident calls for the monthly payment of the designated occupancy fee, and allows Riverview Place to terminate the agreement and evict the resident if the resident is in default for a period of sixty days or more. However, the Occupancy Agreement does contain a provision allowing the management of Riverview Place to subsidize a resident to ensure that the resident does not have to leave the facility "solely due to the inability to pay." The granting of a subsidy is within the "sole discretion" of Riverview Place, and before making application for a subsidy, a resident must agree to first seek "any available family, state or federal financial assistance." A false statement made on the financial information form can disqualify an individual from obtaining a subsidy. Furthermore, residents agree not to make any gifts or dispositions which would impair their ability to satify any financial obligation to Riverview Place. Since the beginning of its operation, no resident has made an application for a subsidy from Riverview Place, and no resident has been evicted due to the inability to meet Riverview Place's financial obligations.

Riverview Place policies also require a resident to be over 55 years of age. The youngest resident at Riverview Place is 63, and the oldest resident is 99 years. The median age of the residents is 82. In addition, the policies contain health requirements for continued residency. Under the Occupancy Agreement, a resident must be able to "function independently" while at Riverview Place. If a person can no longer function independently, Riverview Place assists the individual in relocating to a nursing home or other health care facility, and allows the resident to terminate his or her occupancy agreement under a "short notice" provision. Riverview Place is not a medical facility, and it offers no medical care or treatment for its residents.

This case was commenced on February 26, 1987, when Riverview Place, Inc., filed a Certificate For Real Estate Tax Exemption Claim seeking to exempt its property and buildings from 1987 general real estate taxes. *See* NDCC § 57–02–14.1. Riverview Place claimed that it was an institution of public charity and, therefore, exempt from property taxation under

§ 57–02–08(8), NDCC.[1] The application was disapproved by the Cass County Director of Tax Equalization on the grounds that Riverview Place and its property did not qualify for the exemption under § 57–02–08(8). In rejecting the application, the Director acted on the advice of counsel who reviewed Riverview Place's certificate and exhibits, reviewed the case law surrounding § 57–02–08(8), and recommended rejection of the application. When the property was subsequently assessed for 1987 general real estate taxes, Riverview Place, Inc., timely filed an Application for Abatement and Settlement of Taxes. *See* NDCC ch. 57–23.

The tax abatement application was initially heard before the Board of County Commissioners of Cass County on January 19, 1988. A further hearing on the matter was held on January 26, 1988. Riverview Place had submitted a number of exhibits with its application to the Board of County Commissioners. The Board of County Commissioners, also acting on the advice of counsel, rendered a decision denying the application for abatement of the property taxes on January 26, 1988. Riverview Place subsequently filed a timely notice of appeal to the district court pursuant to NDCC § 11–11–39.

A hearing before the district court was held on November 9, 1988. At the hearing, the district court received evidence from the parties by way of stipulation, exhibits and testimony. The district court subsequently entered its findings of fact, conclusions of law, and order for judgment reversing the Board of County Commission-

er's denial of Riverview Place's application for abatement, and ordered Cass County to exempt Riverview Place's property from taxation for 1987. A judgment was entered, and Cass County timely filed a notice of appeal to this Court.

The issue presented by Cass County on appeal is whether the district court erred when it overturned the Board of County Commissioner's denial of Riverview Place's application for abatement, and found Riverview Place to be an institution of public charity within the meaning of § 57–02–08(8).

Initially, we examine the standard of review to be applied in an appeal from a decision rendered by a board of county commissioners. Section 11–11–39, NDCC, allows an appeal to the courts by any person who was aggrieved by a decision of a board of county commissioners. Moreover, NDCC § 11–11–43 provides:

"All appeals taken from decisions of a board of county commissioners shall be docketed as other causes pending in the district court and shall be heard and determined *de novo.*"[2] [Emphasis added.]

While "de novo" review traditionally permits independent findings of fact by a reviewing court, this Court has found "de novo" review in the context of § 11–11–43 to be much more limited. *See Ulvedal v. Board of County Com'rs*, 434 N.W.2d 707 (N.D.1989). In *Shaw v. Burleigh County*, 286 N.W.2d 792 (N.D.1979), this Court meticulously defined the scope of a "de novo" review of a board of county commissioner's decision under § 11–11–43. For separation of powers purposes,[3] we held:

> The amended version of § 11–11–43 was approved by the Legislature on March 9, 1989. Because, in the instant case, the appeal to the district court was heard in November of 1988, we apply the former version of § 11–11–43. *See Kottke v. U.A.M.*, 446 N.W.2d 23 (N.D.1989).

---

1. Riverview Place, Inc., did not seek a property tax exemption on the grounds that it was a religious institution. *See* NDCC § 57–02–08(7). Nor did Riverview Place, Inc., seek an exemption as a public hospital or nursing home licensed pursuant to NDCC § 23–16–01, which operates under the control of a religious institution. *See* NDCC § 57–02–08(8).

2. In 1989, the North Dakota Legislature amended NDCC § 11–11–43. The amended version of § 11–11–43 was designed to eliminate the "de novo" review standard, and to reform the procedures for appealing from decisions of local governing boards. *See Ulvedal v. Board of County Com'rs*, 434 N.W.2d 707, 709 n. 2 (N.D.1989).

3. In *Shaw v. Burleigh County*, 286 N.W.2d 792 (N.D.1979), we noted that a traditional-type "de novo" review of a board of county commissioners' decision pursuant to § 11–11–43 would be unconstitutional by usurping legislative authority granted to the county commission and improperly delegating such authority to the judiciary. In *State ex rel. Spaeth v. Meiers*, 403 N.W.2d 392, 394 (N.D.1987), we noted:

"[T]hat a 'de novo' hearing, as applied to judicial review of decisions of the Board of County Commissioners under Section 11-11-43, N.D.C.C., means a trial to determine whether or not the Board acted *arbitrarily, capriciously, or unreasonably.* Section 11-11-43, N.D.C.C., must be treated as merely providing the procedure by which the proceeding may be brought before the court to determine whether or not the Board acted properly." [Emphasis added.] *Shaw v. Burleigh County,* 286 N.W.2d at 797.[4]

*Accord Ulvedal v. Board of County Com'rs, supra; Haman v. City of Surrey,* 418 N.W.2d 605 (N.D.1988); *Cloverdale Foods Co. v. City of Mandan,* 364 N.W.2d 56 (N.D.1985); *Pulkrabek v. Morton County,* 389 N.W.2d 609 (N.D.1986); *Larson v. Wells County Water Resource Bd.,* 385 N.W.2d 480 (N.D.1986); *Conway v. Bd. of County Com'rs,* 349 N.W.2d 398 (N.D. 1984). In *Shaw v. Burleigh County, supra,* we recognized the need of trial courts to receive evidence and to take testimony anew for the practical reason that a record is generally not available from a proceeding before a board of county commissioners, and because such proceedings are usually not transcribed. *See also Barnes County v. Garrison Diversion, Etc.,* 312 N.W.2d 20 (N.D.1981). However, we noted that merely because it was necessary to receive evidence and to take testimony at

"The legislative, executive, and judicial branches are coequal branches of government, and each branch is supreme in its own sphere. Art. XI, § 26, N.D. Const.; *State ex rel. Mason v. Baker,* 69 N.D. 488, 288 N.W. 202 (1939). This court has long recognized that the creation of the three branches of government by our constitution operates as an apportionment of the different classes of power whereby there is an implied exclusion of each branch from the exercise of the functions of the others. *Ranta v. McCarney,* 391 N.W.2d 161 (N.D.1986); *City of Carrington v. Foster County,* 166 N.W.2d 377 (N.D.1969); *Kermott v. Bagley,* 19 N.D. 345, 124 N.W. 397 (1910). In recognition of these abiding principles, the judiciary exercises great restraint when requested to intervene in matters entrusted to the other branches of government."

4. *Shaw v. Burleigh County* involved an appeal from a decision of the board of county commissioners concerning the construction and application of a zoning ordinance enacted by the county commissioners. The issue presented by

the trial court level, that necessity provided no basis for the trial court to apply a different scope of review. Thus we concluded that the trial court could only view the evidence to determine whether or not the board of county commissioners acted arbitrarily, capriciously, or unreasonably. Furthermore, this Court has stated that our scope of review is identical to that of the district court's under § 11-11-43, and that on appeal it is our function to independently determine the propriety of the board's decision "without according any special deference" to the district court's findings or conclusions in its review of a board's decision. *See Pulkrabek v. Morton County,* 389 N.W.2d at 613; *Conway v. Bd. of County Com'rs,* 349 N.W.2d at 400; *Shaw v. Burleigh County,* 286 N.W.2d at 797.

In this case, the Board of County Commissioners of Cass County was called upon to determine whether or not Riverview Place was entitled to a real property exemption on the grounds that it was a public charity within the meaning of NDCC § 57-02-08(8). Section 57-02-08 provides, in relevant part:

"57-02-08. *Property exempt from taxation.* All property described in this section to the extent herein limited shall be exempt from taxation:

the instant case involves the construction and application of a state statute. All laws of a general nature are to have a uniform operation. Art. I, § 22, N.D. Const. As a result, the interpretation of a statute is a question of law, fully reviewable by the courts. *Ladish Malting Co. v. Stutsman County, Etc.,* 351 N.W.2d 712 (N.D. 1984). Furthermore, the interpretation of a statute must be consistent with legislative intent and done in a manner which will accomplish the policy, goals and objectives of the statute. *Heartview Foundation v. Glaser,* 361 N.W.2d 232 (N.D.1985). Insofar as a state statute is subject to two interpretations, either of which may appear to be reasonable, we nevertheless would not approve different interpretations or applications of the statute. Therefore, the deference paid to the decision of the local governing body may be less when the construction and application of a state statute is involved than it is when a purely local issue, such as existed in *Shaw v. Burleigh County,* is presented for review.

8. All buildings belonging to institutions of public charity ... used wholly or in part for public charity, together with the land actually occupied by such institutions not leased or otherwise used with a view to profit, and this includes any dormitory, dwelling, or residential-type structure, together with necessary land on which such structure is located, owned by a religious or charitable organization...."

This Court has previously adopted a number of guidelines for use in determining whether a piece of property falls within the tax exemption of § 57–02–08(8). Initially, we have noted that the burden of establishing that property comes within the tax-exemption statute is upon the person or entity who claims the exemption, and that any doubt as to whether the property is used for charitable or benevolent purposes so as to exempt it from taxation must be resolved against the claimant. *See Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs*, 219 N.W.2d 900 (N.D.1974); *Y.M.C.A. of N.D. State Univ. v. Board of County Com'rs*, 198 N.W.2d 241 (N.D. 1972); *North Dakota Soc. for Crippled Child. & Ad. v. Murphy*, 94 N.W.2d 343 (N.D.1959). However, we have also observed that there should be a liberal construction of the language used in order to carry out the expressed intention of the law. We will give a liberal and not a harsh or strained construction to obtain a reasonable result effectuating the intent of the Legislature. *See, e.g., Mills v. Board of County Com'rs*, 305 N.W.2d 832 (N.D. 1981).

■ We have also stated that the determination of whether an institution falls within the exemption is, essentially, a two-step process in which it must be determined "whether the organization claiming the exemption is in fact a charitable one, and whether the property on which the exemption is claimed is being devoted to charitable purposes." *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs*, 219 N.W.2d at 904. *See also* 71 Am.Jur.2d *State and Local Taxation* § 362 (1973). The ownership of the property in question

by an institution of public charity does not, by that fact alone, exempt the property from taxation. *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs, supra; Y.M. C.A. of N.D. State Univ. v. Board of County Com'rs, supra*. Additionally, "[t]he mere fact that the services performed by a charitable corporation also are rendered by profit-making organizations [does] not of itself preclude [a charitable organization's] right to tax exemption." *Y.M.C.A. of N.D. State Univ. v. Board of County Com'rs*, 198 N.W.2d at 244. Rather, "[i]t is the *use* made of the property ... which determines whether the property is exempt from taxation." [Emphasis added.] *Id*. The property's use must be devoted to charitable purposes, and it must actually be used in carrying out the charitable purposes of the organization claiming the exemption. *See Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs, supra; Y.M. C.A. of N.D. State Univ. v. Board of County Com'rs, supra*. Moreover, we have noted that when a charitable organization charges a fee for its services and operates at a small net profit which is reinvested back into the organization's charitable operations, those facts do not automatically disqualify the entity's property from an exemption on the basis that it was operated "with a view to profit," as the concept of charity encompasses "something more than mere almsgiving" and therefore a "benevolent association is not required to use only red ink in keeping its books and ledgers." *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs*, 219 N.W.2d at 907–08. Utilizing these basic guidelines, we review the Cass County Board of Commissioner's denial of Riverview Place's application for abatement to determine if its denial was arbitrary, capricious, or unreasonable.

As previously stated, it is necessary to initially determine whether or not the organization seeking exemption is in fact charitable. The evidence presented below shows that Riverview Place was incorporated in 1986 as a nonprofit corporation pursuant to NDCC ch. 10–24. Its member-shareholders are the Presentation Sisters and the Catholic Health Corporation, both of

which are religious organization listed in the Official Catholic Directory for the United States. Furthermore, the articles of incorporation of Riverview Place state that it was organized for benevolent purposes and to support the mission of the Catholic Church. There is no reason to believe that Riverview Place is not a charity. However, the second step in our analysis is to review the Board of County Commissioner's determination that Riverview Place's property is not actually being used for a charitable purpose.

■ Riverview Place makes a number of arguments claiming that its property is being used for charitable purposes, and not otherwise used with a view to profit. First, quoting from a sentence in *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs*, 219 N.W.2d at 906, that "the use of property for the care of the aged is generally recognized as a charitable use," Riverview Place claims that any aggregate-living facility specifically established for the elderly which is operated by a charitable organization is a devotion of property for charitable purposes. Second, Riverview Place argues that *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs, supra*, allows a charitable organization, which reinvests any income back into its property and operations, to operate at a net profit without automatically being disqualified from tax exemption on the basis that its property is being operated "with a view to profit." Riverview Place notes that it has actually operated at a loss since the beginning of operations, and that even though the feasibility studies projected future net profits, the articles of incorporation of Riverview Place require it to use any monetary gains for the enhancement of its facilities and services.

*Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs, supra,* involved the operation of a congregate-living facility for the aging and infirm by the Evangelical Lutheran Good Samaritan Society. The Society was incorporated in North Dakota as a nonprofit and religious corporation. The average age of the residents at the Society's facility was approximately 70 years,

and most of the residents were in need of care and supervision. As this Court noted:

"Of the 83 residents of the Home, 6 are blind, 23 require wheelchairs, 6 are diabetics, 28 are mentally ill, and 4 are retarded. Most of the mentally ill or retarded patients were formerly patients in State institutions at Jamestown and Grafton, prior to their admission to the Devils Lake Home." *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs,* 219 N.W.2d at 902.

The Society also provided care to its residents including "dispensing medications, giving therapy treatments, taking blood pressures, and keeping a medical chart for each resident in addition to providing for the daily needs of the residents." *Id.* Regarding the financial operations of the Home, sixty-four percent of the residents were welfare recipients, and the cost of caring for the residents was primarily paid for by welfare programs or by the residents themselves. The Home did not provide care for any resident on a "free" basis. For the years 1968 through 1972, the Home produced small profits ranging from between $9,627.61 to $16,756.07. All profits made by the Home were reinvested into the maintenance of the building and to purchase needed furniture and fixtures. On appeal to this Court, the Board of County Commissioners argued that the property of the Home was not devoted to a charitable purpose, and that the property was being operated with a view to profit. This Court disagreed. While making a broad assertion that "the use of property for the care of the aged is generally recognized as a charitable use," the Court specifically noted that the aged often require special care and attention apart from financial assistance, and the supply of this care and attention is a charitable purpose. *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs,* 219 N.W.2d at 906. We also held that when a profit earned by a facility is "directly and entirely related to the . . . charitable use" of the property, and such profit "is reinvested" into the property, a tax exemption to the facility should not automatically be denied on the grounds that the facility is operated with a view to

profit. *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs*, 219 N.W.2d at 908.

We believe that Riverview Place misapplies the holding in *Evangelical Luth. G. Sam. Soc. v. Board of Cty. Com'rs* when it argues that any aggregate-living facility established for the elderly constitutes a devotion of property for a charitable purpose on the grounds that "the use of property for the care of the aged is generally recognized as a charitable use." The residents in *Evangelical* were not just "elderly." Rather, the residents at the Devils Lake facility were elderly persons with a demonstrated need for considerable care and supervision. Most residents had some sort of physical or mental affliction, and most residents at least received some minimal type of care and supervision in the form of dispensing medicines, giving therapy treatments, and the like. In *Evangelical*, it was the care given to the aged that was recognized as a charitable use. Indeed, Riverview Place's quotation from *Evangelical* that "the use of property *for the care of the aged* is generally recognized as a charitable use," demonstrates that a facility for the elderly must supply some type of care for their residents in order to constitute a charitable use.

Here, the record does not reflect any evidence presented by Riverview Place to indicate that their residents have a demonstrated need for care or charity. In fact, the record is absent of evidence to show that residents of Riverview Place are anything but "functionally independent" and fully capable of living on their own while at Riverview Place. Furthermore, there is nothing to demonstrate that "care" is being rendered to the elderly at Riverview Place. When compared to the residents of the facility in *Evangelical*, the residents at Riverview Place do not receive any form of periodic monitoring for health or other purposes. In short, we believe that *Evangelical* requires something more than merely providing an aggregate-living facili-

ty for the elderly in order to qualify as a charitable use of property under § 57–02–08(8). Rather, in order for similar facilities to qualify as a charitable use of property, *Evangelical* requires the organization operating a living-facility to also provide care to elderly persons who have a demonstrated need for it. Here, Riverview Place simply provided attractive residences to "functionally independent" elderly persons, and offered them features such as greenhouses, chapels, coffee shops, party catering, and other similar amenities. We conclude that the Cass County Board of County Commissioners could have properly found that the property of Riverview Place did not qualify for a tax exemption under § 57–02–08(8), and that its decision to deny the exemption was not "arbitrary, capricious, or unreasonable." [5]

In view of our conclusion that the use of Riverview Place's facilities do not constitute a "charitable use" of the property, we need not address the second argument of Riverview Place regarding profits earned by a charitable organization. As we have already noted, it is only when the profit earned by a facility is "directly and entirely related to the ... charitable use" of the property that a tax exemption should not automatically be denied on the grounds that the facility is operated with a view to profit.

█ In an appeal from a decision of a board of county commissioners denying a tax exemption, a trial court may not substitute its judgment for that of the board when there is no showing that the board acted arbitrarily, oppressively or unreasonably, or when it has not been shown that the evidence did not support the board's decision. *Appeal of Johnson*, 173 N.W.2d 475 (N.D.1970). As we have found that the Board of County Commissioners did not act arbitrarily in denying Riverview Place ex-

---

5. In reaching this decision, we note that many courts have denied "charitable" tax exemptions to homes for the aged which have imposed substantial fees, stringent health requirements, and afforded little care to their residents. *See* *generally*, Annotation, *Homes for the Aged as Exempt From Property Taxation*, 37 A.L.R.3d 565 (1970). *See, e.g., Madonna Towers v. Commissioner of Taxation*, 283 Minn. 111, 167 N.W.2d 712 (1969).

empt status under § 57–02–08(8), the judgment of the district court is reversed.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.