**In re Appeal of Colonial Pipeline**

---

IN THE MATTER OF: THE APPEAL OF COLONIAL PIPELINE, A PUBLIC SERV-
ICE COMPANY ENGAGED IN BUSINESS IN NORTH CAROLINA, FROM THE VALUATION OF
ITS PROPERTY BY THE NORTH CAROLINA PROPERTY TAX COMMISSION FOR 1981

No. 225PA84

(Filed 29 August 1986)

1. **Taxation § 25.7— gas pipeline system—ad valorem taxes—market value—use of imbedded, historical cost of debt improper**

    The Property Tax Commission erred in approving the Revenue Department's use of petitioner's imbedded, historical cost of debt rather than current market cost in arriving at a proper capitalization rate under the income approach to value, since the Revenue Department's appraiser sought to justify use of the imbedded cost of debt on the ground that the debt was assumable by a prospective purchaser, but petitioner's guaranteed debt could not be assumed by a purchaser, and since the record did not support the Property Tax Commission's weighting of the debt and capital components used in its calculation.

2. **Taxation § 25.7— gas pipeline system—ad valorem taxes—projected income stream—inclusion of investment tax credits improper**

    The Department of Revenue erred in including in petitioner's projected income stream a figure representing petitioner's average investment tax credits over the past five years, since petitioner would continue to have investment tax credits in the future equivalent to those it had enjoyed in the past only if it continued to invest in depreciable property at the same rate it had invested in the past and tax laws on the subject do not change, and there was no evidence to support the fact that there would be such credits in the future for petitioner.

3. **Taxation § 25.7— gas pipeline system—ad valorem taxes—refusal to reduce property values for economic obsolescence—no error**

    The Property Tax Commission did not err in approving the Revenue Department's refusal to reduce FERC valuations of petitioner's system property under the cost approach to value because of "economic obsolescence" attributable to the below market rate of return allowed petitioner by the FERC, since deductions for "economic obsolescence" are matters of appraisal judgment about which reasonable appraisers could differ, and the Commission was not required to adopt one appraiser's view of the matter in the face of an equally plausible contrary opinion.

ON Colonial Pipeline Company's petition for discretionary review of a decision of the Court of Appeals, 67 N.C. App. 388, 313 S.E. 2d 819 (1984), affirming an order of the North Carolina Property Tax Commission entered 4 November 1982.

*Lacy H. Thornburg, Attorney General, by Marilyn R. Mudge, Assistant Attorney General, for the state.*

*Hunton & Williams, by Henry S. Manning, Jr., and William L. S. Rowe, for appellant Colonial Pipeline Company.*

EXUM, Justice.

This is an ad valorem tax case in which the petitioner, Colonial Pipeline Company, hereinafter "Colonial," contends that the North Carolina Department of Revenue, "Department," first, and then the Property Tax Commission, "Commission," overvalued Colonial's system property for ad valorem tax purposes. Colonial contends further that the Court of Appeals erred in affirming the Commission's decision on valuation. Specifically, Colonial contends that it was error for the Court of Appeals to affirm the taxing authorities: (1) use of imbedded book cost of debt, rather than market cost, in arriving at a capitalization rate in the income approach to valuation; (2) inclusion of certain investment tax credits in the stream of income to be capitalized under the income approach to value; (3) refusal to reduce Colonial's system property values as reported to the Federal Energy Regulatory Commission, "FERC," under the cost approach to value because of intervening "economic obsolescence." Largely on the basis of our decision in *In re Southern Railway*, 313 N.C. 177, 328 S.E. 2d 235 (1985),[1] we conclude the Court of Appeals erred as to points one and two. We conclude the Court of Appeals correctly determined point three. We, therefore, reverse in part and affirm in part the Court of Appeals' decision.

I.

Pursuant to subchapter II of chapter 105 of our General Statutes, hereinafter "Machinery Act" or "Act,"[2] the Department valued Colonial's system property (Colonial being a "public service company" subject to ad valorem taxation under § 333(14)) at $1.216 billion. The Department allocated $160 million to North

1. Our decision in *Southern Railway* was rendered after the Commission's and the Court of Appeals' decision in the instant case.

2. Since all references to statutes herein are contained in subchapter II of chapter 105, we shall refer only to section numbers of the chapter.

Carolina. §§ 337, 338. Colonial appealed to the Property Tax Commission.

At the hearing before the Commission, the principal witnesses were Robert H. McSwain, for Colonial, and William R. Underhill, for the Department. McSwain is a Member of the Appraisal Institute, the professional designation of the American Institute of Real Estate Appraisers; a Senior Real Property Appraiser, the professional designation of the Society of Real Estate Appraisers; and a Certified Assessment Evaluator, the professional designation of the International Association of Assessing Officers. He teaches railroad and public utility valuation at the college level and has held various memberships and offices in professional organizations. Underhill is employed by the North Carolina Department of Revenue and is an experienced appraiser of public service companies. He is a member of several professional associations. Both witnesses were qualified as experts in the field of utility appraisal.

The Machinery Act requires that public service companies, such as Colonial, be appraised for ad valorem tax purposes by determining the "true value" of the company's "system property used . . . both inside and outside this State." § 335(b)(1). "System property" is that property used in the company's public service activities and any property under construction "which when completed will be used" in the company's public service activities. § 333(17). True value means "market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell . . . ." § 283. The public service company's entire system property, without geographical or functional division, is appraised and a portion of the appraised value is allocated to North Carolina by various statutory formulae. § 337. *See generally, In re Southern Railway*, 313 N.C. 177, 328 S.E. 2d 235.

Both McSwain and Underhill used three methods of appraisal, prescribed by § 336, commonly referred to as (1) the income approach, (2) the stock and debt approach, and (3) the cost approach. The income approach to value is based on the principle that something is worth what it will earn. Under this approach fair market value is determined by capitalizing at a specified rate

of return future income which the appraiser believes can reasonably be earned on the company's system property. The formula is: value equals income divided by rate. The rate is that rate of return that would be required by a reasonably prudent investor in order to induce the investor to commit capital to the purchase of the property generating the income. The stock and debt approach to value relies simply on a market valuation of the company's outstanding stock and debt. § 336(a)(1). This approach is based on the theory that the value of the company's assets on the left side of the balance sheet should equal the value of its outstanding liabilities and capital on the right side of the balance sheet. The values arrived at in this manner must be adjusted so as to remove the influence of any non-system, non-taxable property. The cost approach starts with the book value of all the company's system property as shown on the books kept by the appropriate state or federal regulatory agencies. Consideration is then given to the replacement or reproduction costs of this property "less a reasonable allowance for depreciation." § 336(a)(2).

Both McSwain and Underhill relied essentially on the same basic facts, business operations and accounting data, in making their appraisals. It is undisputed that Colonial is the nation's largest volume petroleum products pipeline. It delivers refined petroleum products through more than 5,000 miles of pipeline extending from refineries near Houston, Texas to the New York harbor area. Most of the pipeline was built between 1961 and 1978. Colonial's last major construction program ended in 1980, and the company had no major construction plans or programs in effect on 1 January 1981, the date of the valuation of its property. Colonial is a common carrier regulated by FERC. Its stock is owned by ten other corporations, all of which are members of the petroleum industry. As a common carrier Colonial's transportation service must be offered on a non-discriminatory basis, and preferential treatment cannot be given to its stockholders. Colonial has a capital structure of 94% debt, almost all of which is long-term, and 6% equity. Its long-term debt is guaranteed by its stockholders and cannot be assumed by a purchaser of Colonial's assets. FERC authorizes Colonial to earn on an average not more than a 10% rate of return on its FERC valuation. Unlike other utilities, this rate of return is not determined by Colonial's overall

cost of capital and is not influenced by either its capital structure or the capital cost of the components of that capital structure.

McSwain appraised Colonial's system property at $970,000,000. This was based upon an income indicator of value of $965,000,000, a stock and debt indicator of $939,400,000, and a cost indicator of $972,000,000. Underhill's appraisal of Colonial's system value was $1,216,000,000. It was based upon an income indicator of value of $1,186,941,543, a stock and debt indicator of $1,052,739,985, and a cost indicator of $1,279,568,881.

In their income approach to value McSwain and Underhill disagreed as to the amount of the future income stream to be capitalized and as to the weighted capitalization rate to be applied. McSwain capitalized projected net operating income of $135,000,000 at 14%. Underhill capitalized a projected net operating income of $131,187,600 at 11.2% and added to the result $15,623,543 for construction work in progress.

The difference in the projected future net income to be capitalized given by the two appraisers was primarily due to the difference in treatment of certain investment tax credits previously claimed by Colonial. For the years 1976 through 1980 Colonial had an average investment tax credit per year of $12,882,800. Underhill included this amount in his projected future net income; McSwain did not.

Both Underhill and McSwain agreed that in determining the capitalization rate an appraiser should assume that a prudent investor would commit both debt and equity capital to the purchase of Colonial's system property at a ratio of 55% debt and 45% equity. McSwain used a capitalization rate of 14% based on a 16% return on equity weighted at .45 and market rate of return for debt of 12.5% weighted at .55. Underhill, on the other hand, used a capitalization rate of 11.2%. He weighted a 15% rate of return on equity at .45 and an 8% return for debt, equivalent to Colonial's imbedded debt cost, at .55. Underhill admitted that the market cost of debt on 1 January 1981 was 12%. Had he used a 12% market rate for debt, rather than the 8% rate based on Colonial's imbedded debt cost, Underhill's income indicator of value would have been $998,302,351, $188,639,192 less than his income indicator in which he used Colonial's imbedded debt cost and very close to McSwain's income indicator.

Both Underhill and McSwain used similar procedures under the stock and debt approach to value. Both agreed on the value to be ascribed to Colonial's debt. In order to arrive at the value of the capital stock, the stock not being traded on the market, both appraisers capitalized income available to the equity component of Colonial by the market rate of return demanded by investors for similar investments. The difference between their approaches using this method of valuation, which forms the basis for one of Colonial's complaints, is that Underhill, again, included in the projected future stream of income to be capitalized, projected investment tax credits, based on the annual average of credits taken by Colonial in the past. McSwain did not include such credits in his projection of Colonial's future income.

In the cost approach to value the only significant difference between the appraisers' calculations was in their treatment of "economic obsolescence." Both appraisers relied on FERC valuations of Colonial's assets. Underhill adjusted this valuation for working capital, a 6% going concern value and construction work in progress to arrive at a cost indicator value of $1,279,568,881. McSwain arrived at an adjusted FERC valuation of $1,292,322,222, which he reduced by 25.36% to $971,716,313 to allow for "economic obsolescence." McSwain arrived at the 25.36% reduction on these grounds: Investors were demanding a minimum rate of return in the market of 14% for investments similar to Colonial. Because of FERC's ceiling on Colonial's rate of return, Colonial could only earn in 1981 10.45% on its adjusted FERC valuation. The difference between what Colonial could earn and what investors were demanding was 3.55 percentage points. This deficiency amounted to 25.36% of the 14% market rate of return. In McSwain's opinion because investors could not earn what the market demanded by investing in Colonial, the value of Colonial's system property should be reduced accordingly for what he called "economic obsolescence."

With this evidence before it, the Commission adopted Underhill's appraisal, thus approving Underhill's use of the imbedded cost of debt to arrive at an appropriate capitalization rate, his inclusion in the projected future income stream to be capitalized projected investment tax credits, and his refusal to reduce FERC's valuation under the cost approach for economic obsolescence.

## II.

[1] Applying the whole record test for appellate review as is required and as we did in *Southern Railway*, we conclude the Commission erred on this record in approving the Department's use of Colonial's imbedded, historical cost of debt rather than current market cost in arriving at a proper capitalization rate under the income approach to value. On a record similar to that now before us we held in *Southern Railway* that the Department was not justified in using imbedded cost of debt to arrive at an appropriate capitalization rate in the income approach to value for ad valorem tax appraisal purposes. *Southern Railway* controls this issue here.

Indeed the record here is even less supportive of the use of imbedded debt cost than it was in *Southern Railway*. There the Department sought to justify use of imbedded debt on the grounds that the debt was assumable by a prospective purchaser. This is the ground upon which Underhill, the Department's witness, sought to justify use of the imbedded cost of debt in the instant case. He said, "It's my opinion under the willing-buyer-willing-seller concept, that the typical purchaser would buy the equity of a typical pipeline company and assume the debt at its existing rate. And this would assume also a typical capital structure." Yet even Mr. Underhill later testified that he understood Colonial's guaranteed debt could not be assumed by a purchaser. Consequently any purchaser would have to refinance the purchase at current market rates.

The Department argues that even if under *Southern Railway* it was improper to use imbedded cost of debt in arriving at a capitalization rate under the income approach to value, the error did not result in a substantially higher valuation than would have been reached under a proper method. This argument rests on a calculation made by the Commission under the income approach to value using a capitalization rate based on market rates rather than imbedded rates. The result comes close to the Department income indicator of value. We have carefully examined the Commission's calculation. The Commission used McSwain's income stream of $135,000,000. It used a cost of debt of 12% and a return to equity of 15%. It then, however, weighted the debt component at .936 and the equity component at .64, giving a weighted capitalization rate of 12.19%. Capitalizing $135,000,000 at 12.19% gives a

value of $1,107,460,000, which is 93.3% of the Department's income indicator of $1,186,941,543. The Commission weighted the cost of debt and return to equity on the same ratio as exists in Colonial's actual capital structure. Yet both appraisers agree that in figuring a capitalization rate for use in the income approach to value, the ratio between cost of debt and return to equity should not reflect Colonial's actual capital structure but should reflect, instead, a more normal capital structure of 45% equity and 55% debt. The reason given is that this is the ratio at which a reasonably prudent buyer willing but under no compulsion to buy would likely commit capital. The record, therefore, does not support the Commission's weighting of the debt and capital components used in its calculation. This weighting looks only at value seen from the perspective of the owner-seller — an approach which we held was impermissible in *Southern Railway* under the willing seller-willing buyer approach to market value.

## III.

[2] It is also clear on this record that the Department and, ultimately, the Commission erred in including in Colonial's projected income stream a figure representing Colonial's average investment tax credits over the past five years. Both the Department and Colonial agree that an investment tax credit is a credit allowed against a taxpayer's federal income tax liability in an amount equal to 10% of the taxpayer's investment in certain depreciable property during the tax year. Existence of the credit is dependent upon the taxpayer's investment during the tax year. Once the credit is taken, it no longer exists. Colonial, therefore, will continue to have investment tax credits in the future equivalent to those it has enjoyed in the past only if it continues to invest in depreciable property at the same rate it has invested in the past and tax laws on this subject do not change. There is a stipulation in the record that Colonial's last major construction program ended in 1980 and "since determination of this project in 1980, Colonial . . . has had no major construction plans or programs in effect." There is, therefore, no factual basis on this record for including in Colonial's projected future income stream amounts attributable to future investment tax credits, for there is no evidence to support the fact that there will be such credits in the future for Colonial.

The projected future income stream, moreover, must be based on what could reasonably be expected to be earned on Colonial's system property existing on the date of the appraisal adjusted for work in progress on that date. On Colonial's system property existing on the date of the appraisal, the evidence is that all investment tax credits have been taken. No future investment tax credits will be available.

On a record very similar to the one now before us, we held in *Southern Railway* that it was error for the Commission to include in projected future income to be capitalized deferred income tax expense. The Department sought to justify inclusion on the ground that the deferred taxes would never be paid. We said:

> This testimony demonstrated, and the Department's witness did not contravene it, that in order for deferred income taxes to be perpetually immune from payment, the Railroads would have to maintain increasingly greater levels of investment necessary to obtain new depreciation in amounts sufficient to offset the reduced depreciation attributable to older assets. Further, the accelerated depreciation provisions of the income tax laws would have to remain in place. Railroads' evidence demonstrated that potential buyers and sellers would not appraise the railroad system on the assumption that these kinds of investments would continue to be made, or that accelerated depreciation provisions would be forever with us. This is true notwithstanding the fact that Southern's capital acquisitions over the last several years have been so large that it has continued to accumulate deferral tax expenses and, in fact, has paid no income tax.

*In re Southern Railway*, 313 N.C. at 194-95, 328 S.E. 2d at 246 (footnote omitted).

We recognize the difference between investment tax credits and deferred income tax expense, the former being explained hereinabove and the latter in *Southern Railway*. Nevertheless, insofar as the inclusion of both in the income stream to be capitalized rests on the notion of continuing future capital expenditures and static tax laws, the decision in *Southern Railway* controls the point. Indeed, the record here is even less supportive of inclusion of investment tax credits in the income stream than the record in *Southern Railway* was of including deferred income tax expense.

First, the derivation of investment tax credits and their relationship to the system property upon which the projected future income stream is in turn derived is clearer than in the case of deferred income tax expense. Second, it is clearer in this case that the investment tax credits attributable to the property to be appraised have in fact been exhausted and will not be available in the future than it was in *Southern Railway* that the deferred tax expense there attributable to the property being appraised would not in the future be available.

The Department attempts to justify inclusion of the investment tax credits in the income stream by noting that on 31 December 1980 Colonial's balance sheet showed construction work in progress in excess of $15,000,000. Underhill, however, adjusted his calculations based on income approach to value by adding $15,600,000 to his income indicator for construction work in progress. Indeed, this seems to be the proper way to account for construction work in progress in determining system property value under § 333(17) of the Machinery Act.

## IV.

[3] We find no error, however, in the Commission's approval of the Department's refusal to deduct from the FERC valuations an amount attributable to "economic obsolescence" because FERC has limited Colonial's rate of return to a rate below the market rate. McSwain testified:

> Economic obsolescence is a loss in value due to factors outside the property itself. In this case, because the property did not earn a market rate of return, in my opinion a purchaser would not pay the amount for the property reflected on line 13 [the FERC valuation of Colonial's property]. If he paid that amount for the property, he would receive, based on my projected income, a return of 10.45%.

Arlo Woolery, an expert real estate appraiser, testified for Colonial in support of McSwain's appraisals. He testified:

> I heard Mr. McSwain's testimony that this line 14 is obsolescence. As to whether he actually means to say economic obsolescence, I don't know whether it's economic or functional. I think that whenever you have loss in income, you can have a semantic argument about whether that loss is econom-

ic or functional obsolescence. In fact, now they've even abandoned in some textbooks the term "economic obsolescence", and they've gone to what is called locational obsolescence. They are simply saying a thing becomes obsolescent by virtue of its location, and that allows the obsolescence factor to be applied to land, which is departure from the classical textbook theory that was popular years ago. I think you're going to be seeing that appear in appraisal textbooks more and more.

I would not agree that we can just go ahead and mark off this line 14 and talk about land obsolescence; I'm simply saying that it becomes immaterial what you call it, whether it be functional or economic. The fact remains that if a property does not earn the market rate of return, it has lost value. And if you're using cost as an indicator of value, you must make an adjustment for that loss in income to bring the value to a point where it will earn at the market market [sic] rate. I think Mr. McSwain is talking about economic obsolescence and perhaps some functional underlined on line 14.

He used the figure of 25.36 percent as reduction for obsolescence. I believe Mr. McSwain's testimony was that he reduced it by that amount becuase [sic] of a complicated formula that took into account the fact that Colonial is regulated by FERC and FERC allowed only a 10 percent return on the FERC valuation, and the market rate demand is 14.5 percent.

As to whether that entire calculation would be premised on the assumption that the equity investors of Colonial would be free to choose this type of investment and would weigh then whether he wanted to receive a 10 percent return on his money or 14.5 percent at the market rate, I don't think that either Mr. McSwain or I ever suggested that the investors were taking a 10 percent return on money. As I recall the McSwain appraisal, his overall rate of return was 14 percent. And what he was saying was that investors are looking for a 14 percent rate of return. The fact that FERC may allow 10.59, I believe, as a catch-up rate of return on its rate base—and there's a difference between tax base and rate base, as I'm sure all you gentlemen know. That difference between the 14 percent investors are seeking in the market-

place and the 10.59 being earned on FERC rate base would represent a loss in value due to obsolescence however defined.

Woolery had earlier explained "economic obsolescence" in terms of a reduction in the value of the property because of the erection nearby of an unsuitable improvement, for example, a slaughterhouse.

Underhill testified:

It's my opinion that in any regulated utility company that has a rate base as set by a regulatory agency, that . . . rate base is a reasonable indicator of market value standing alone. It doesn't mean that the final value will not reflect some obsolescence or value less than that figure. But I believe that in the cost approach that rate base figure is a reasonable indicator of market value and does not require an obsolescence adjustment. When I speak of rate base, by that I mean FERC valuation, and that is my reasoning for not applying an economic obsolescence factor.

On this state of the record, we conclude the Commission was justified in not adopting McSwain's view of the necessity of reducing the FERC valuations in the cost approach to value because of "economic obsolescence" attributable to the rate of return allowed by FERC on the rate base found by FERC. Colonial concedes that McSwain's "determination of economic obsolescence is an opinion." This record demonstrates that deductions for "economic obsolescence" are indeed matters of appraisal judgment about which reasonable appraisers may differ. As such, the Commission was not required to adopt McSwain's view of the matter in the face of an equally plausible contrary opinion.

It is difficult, moreover, for us to discern how a rate of return set by a regulatory agency can ever be considered "economic obsolescence." Presumably, the rate of return is a fair rate of return on the regulatory agency's determination of the utility's rate base. Further, prospective purchasers of Colonial's system property would not necessarily be bound by the rate of return set by FERC on this property as it exists in the hands of Colonial. This record, moreover, does not support the notion that economic obsolescence comes within the meaning of "a reasonable allow-

ance for depreciation," as those terms are used in § 336(a)(2) of the Machinery Act.

## V.

Because of the errors committed by the Commission in connection with its approval of the use of imbedded cost of debt rather than market cost and inclusion in the income stream of investment tax credits, we conclude Colonial has overcome the presumption of correctness of the appraisals of the Department of Revenue. Colonial's burden was to show that the Department used either an arbitrary or an illegal method of valuation and that the Department's valuation substantially exceeded the fair market value of Colonial's system property. *In re Southern Railway,* 313 N.C. 117, 328 S.E. 2d 235. "An illegal appraisal method is one which will not result in a 'true value' as that term is used in § 283 and, for public service companies, in § 335." *Id.* at 181, 328 S.E. 2d at 239. The methods identified, as we have shown, will not result in true value; therefore, they are illegal.

Further, as we have demonstrated, had the Department used a market rate of return instead of Colonial's imbedded cost of debt, the Department's income indicator of value would have been $998,302,351, substantially less than its income indicator, using imbedded cost, of $1,186,941,543. Also, the Department's treatment of the investment tax credit had the effect of inflating the income stream of Colonial by some $12,282,800 in both the income approach and the stock and debt approach to value. Under the income approach this added some $115,025,000 to the Department's valuation even if the Department's erroneously low capitalization rate of 11.2% is used. It is not clear what effect the Department's inclusion of the investment tax credits in the income stream had on its ultimate valuation under the stock and debt approach.

The errors we have identified affect both the Department's income and stock and debt approach to value—two out of the three indicators used.

We are, therefore, satisfied that erroneous use of imbedded cost of debt and the erroneous inflation of the projected income stream of Colonial by inclusion of future investment tax credits caused the Department's valuations to be substantially higher

than the fair market value of Colonial's system property. *In re Southern Railway*, 313 N.C. 177, 328 S.E. 2d 235.

We reverse the Court of Appeals insofar as it affirmed the Commission's use of imbedded cost of debt and inclusion of investment tax credits in the income stream. We affirm the Court of Appeals insofar as it approved the Commission's rejection of Colonial's reduction of FERC valuations by a factor attributable to "economic obsolescence." We remand the case to the Court of Appeals with instructions that it remand to the North Carolina Property Tax Commission in order that the Commission may determine the system valuation of Colonial's property in a manner consistent with this opinion.

Reversed in part; affirmed in part; remanded.