MIDWEST PROCESSING COMPANY, A SUBSIDIARY OF ARCHER DANIELS MIDLAND COMPANY, Plaintiff and Appellant,

v.

McHENRY COUNTY, acting By and Through the McHENRY COUNTY BOARD OF COMMISSIONERS, Defendant and Appellee.

Civ. No. 900377.

Supreme Court of North Dakota.

April 2, 1991.

Pringle & Herigstad, P.C., Minot, for plaintiff and appellant, argued by David J. Hogue.

Lyle Gregory Witham (argued), State's Atty., Towner, for defendant and appellee.

Appearance by Robert W. Wirtz, Asst. Atty. Gen., State Tax Dept., Bismarck, amicus curiae on behalf of State Tax Dept.

ERICKSTAD, Chief Justice.

Midwest Processing Company, a subsidiary of Archer Daniels Midland Company (Midwest), appeals following a judgment of the District Court for the Northeast Judicial District, dated August 15, 1990, which affirmed the decision of the McHenry County Board of Commissioners (Board), dated June 5, 1990, which denied Midwest's request for an abatement of its taxes. We affirm.

On August 16, 1988, Midwest was purchased by Archer Daniels Midland Company. The property had an assessed value of $6,963,320, which was based upon an appraisal performed by the State Tax Commissioner's Office, dated March 24, 1988.

In February of 1989, Midwest requested an abatement of its 1988 taxes. Subsequent to a recommendation for denial of the abatement request by the Governing Board of Brown Township, the McHenry County Board of Commissioners held a hearing to consider Midwest's application for abatement. The hearing was conducted on February 27, 1989, and was scheduled to be continued on May 2, 1989. However, because both parties failed to provide additional evidence concerning the value of the plant, the hearing was continued until such material could be provided. On May 18, 1989, additional materials were provided by the State Tax Commissioner's appraiser. During July 1989, Midwest provided its additional material. On August 21, 1989, the Board made an on-site inspection of the plant.

On August 28, 1989, the Board reconvened to conclude the hearing. At the close of the evidence, the Board requested both sides to provide additional evidence concerning the issue of economic obsolescence. The State Tax Commissioner's appraiser provided supplemental evidence in the form of a letter on September 8, 1989. Midwest provided additional evidence on September 18, 1989. On November 7, 1989, the Board signed its findings of fact and conclusions of law, and determined the value of the property to be $6,948,694.

Midwest appealed the decision of the Board to the District Court for the Northeast Judicial District. On March 21, 1990, the district court remanded the case to the Board for the consideration of additional evidence.

In early 1990, Midwest initiated a request for an abatement of its 1989 taxes. A hearing was subsequently held on April 30, 1990, before the Board. At that time, both parties agreed that any evidence provided during either the 1988 or 1989 hearings would be considered in both requests for abatement.

On June 5, 1990, the Board determined that the value of the property for both requests, considering an economic obsolescence factor of 35%, to be $6,948,694. The two requests were combined for appeal. On August 1, 1990, the district court affirmed the Board's decision. This appeal followed.

Our standard of review, when considering the decision of a local taxing authority, is limited to determining whether or not the Board acted in an arbitrary, capricious, or unreasonable manner. *Koch Hydrocarbon v. Bd. of Equalization,* 454 N.W.2d 508 (N.D.1990); *Riverview Place, Inc. v. Cass County,* 448 N.W.2d 635 (N.D.1989); *Ulvedal v. Board of County Commissioners,* 434 N.W.2d 707 (N.D.1989); *Shaw v. Burleigh County,* 286 N.W.2d 792 (N.D.1979).

Midwest makes the following two assertions on appeal:

"I. McHENRY COUNTY ARBITRARILY RELIED ON ECONOMIC OBSOLESCENCE AT THE RATE OF 35 PERCENT WITHOUT ANY EVIDENCE

II. THE *JOHNSON—SOO LINE—SHAW* STANDARD OF REVIEW SHOULD NOT APPLY TO VALUATION OF UNIQUE INDUSTRIAL PROPERTY"

I. Economic Obsolescence.

Midwest asserts that the state appraiser (Barry Hasti) failed to adequately explain how he determined the amount of economic obsolescence. Mr. Hasti asserted that there are at least three methods of calculating the amount of economic obsolescence: 1) the amount of available production resources divided by the amount of production capacity; 2) the actual rate of return divided by the projected rate of return; and, 3) the original cost of the plant divided by the sales price of the plant. Mr. Hasti's appraisal, adopted by the Board, utilized the first of the above methods; *i.e.,* the available supply of sunflower seeds was divided by the available processing capacity. The following table was provided by Mr. Hasti to illustrate his calculation of economic obsolescence under this method:

"Table II

SUNFLOWER PRODUCTION AS
PERCENT OF CRUSH
CAPACITY

| Year | North Dakota Production, metric tons | Percent of North Dakota Crushing Capacity |
|------|------|------|
| | (000) | |
| 1985 | 892 | 73.4% |
| 1986 | 731 | 60.2 |
| 1987 | 814 | 66.9 |
| 1988 | 499** | 41.0 |

** Production was down in 1988 compared to 1987 in spite of an increase in the number of acres planted. The cause of the decrease may be attributed to the dry weather conditions for the 1988 crop year."

These calculations are based upon an optimum crushing capacity of 1,215,450 metric tons per year.[1]

Midwest contends that Mr. Hasti subjectively determined the amount of economic obsolescence as opposed to utilizing an accepted mathematical formula. We disagree.

When we consider the table, the following estimates of economic obsolescence are shown: 1985 — 26.6% (100% — 73.4% = 26.6%); 1986 — 39.8% (100% —

* * * * * *

The total annual crush capacity, of the three plants in North Dakota, is 3,700 MT/day times 365 days = 1,350,500 MT. Optimum efficiency has been expressed as 90% of the capacity because of downtime for maintenance. Annual optimum crush capacity is 1,350,500 MT times 90% = 1,215,450 MT.

1. The state appraiser based his calculations upon North Dakota sunflower production and the crushing capacity available in North Dakota. The state appraiser calculated the available North Dakota crushing capacity as follows:

| Plant | Crush Capacity metric tons/day |
|------|------|
| Cargill, Riverside, ND | 1,200 |
| MPC, Velva, ND | 1,000 |
| NSI, Enderlin, ND | 1,500 |
| ND crush capacity | 3,700 MT/day |

60.2% = 39.8%); 1987 — 33.1% (100% — 66.9% = 33.1%); 1988—a discussion of Mr. Hasti's exclusion of 1988 figures from his estimate can be found in the following section of this opinion. An average of the years 1985–1987 yields an economic factor of 33.17%. Estimates of economic obsolescence necessarily involve appraisal judgment and the very nature of economic obsolescence defies measurement. *See generally, Truitt Bros., Inc. v. Department of Revenue,* 302 Or. 603, 732 P.2d 497, 502 (1987); *Appeal of Colonial Pipeline Co.,* 318 N.C. 224, 347 S.E.2d 382, 389 (1986). We cannot conclude Mr. Hasti acted subjectively in estimating economic obsolescence at 35% when that figure only varies 1.83% from the average of the calculations provided in the above table. The above table, which was included within a three-page memorandum concerning economic obsolescence, submitted to the Board by Mr. Hasti at the request of the Board, adequately shows that Mr. Hasti did not "subjectively" determine the amount of economic obsolescence.

Mr. Hasti's memorandum does raise two related questions. Our first question is whether or not it was proper for the state appraiser to ignore the low level of production in 1988 on the basis that the low production during that year was due to dry weather conditions; the above table indicates that in 1988 only 41% of the crushing capacity was used which appears to indicate an economic obsolescence factor of 59%.

Midwest, in a letter to the McHenry Board of County Commissioners dated September 18, 1989, defines economic obsolescence as:

"Economic Obsolescence may be defined as follows: 'Impairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market. Loss in the use and value of a property arising from the factors of economic obsolescence is to be distinguished from loss in value from physical deterio-

ration and functional obsolescence, both of which are inherent in the property. Also referred to as Locational or Environmental Obsolescence.' Boyce, Byrl N., *Real Estate Appraisal Terminology.*"

■ A similar definition was provided by the Supreme Court of Kansas:

" 'The loss in usefulness of an asset, occasioned by the approach to the stage of *economic uselessness through progress of the arts; economic inutility arising from external causes.* Obsolescence refers to *disappearing usefulness* resulting from invention, change of style, legislation, or other causes having no physical relation to the object affected. . . .' (Emphasis added.)"

*Northern Natural Gas Company v. Dwyer,* 208 Kan. 337, 492 P.2d 147, 163 (1971) (quoting E.L. Kohler, "A Dictionary for Accountants" (3rd Ed.)). *See Ames v. C.I.R.,* 626 F.2d 693, 696 (9th Cir.1980); *Governours Square Apts. v. State Bd. of Tx Com'rs,* 528 N.E.2d 864, 866 (Ind.Tax 1987); *Meridian Hills Country Club v. State Bd. of Tax Com'rs,* 512 N.E.2d 911, 915 (Ind.Tax 1987); *Truitt Bros., Inc. v. Dept. of Revenue,* 302 Or. 603, 732 P.2d 497, 502 (1987); *Anaconda Co. v. Property Tax Dept.,* 94 N.M. 202, 207, 608 P.2d 514, 519 (N.M.App.1980); *Piazza v. Town Assessor of Town of Porter,* 16 A.D.2d 863, 228 N.Y.S.2d 397, 398 (1962). Essentially, economic obsolescence is a form of depreciation which may be applicable when physical depreciation fails to adequately recognize the decline in value. *Anaconda,* 94 N.M. at 207, 608 P.2d at 519 (quoting 4 Martens, Law of Federal Income Taxation § 23.104 (1973)). Like physical depreciation, economic obsolescence provides a method for determining the remaining value of the useful life of an asset. *Id.; Ames,* 626 F.2d at 695.

■ Economic obsolescence may result from a number of different factors, but an element of incurable or permanent impairment prevails throughout all of the potential causes.[2] *See Governours Square*

---

**2.** We recognize that an increase in the future

production of sunflower seeds may result in a

*Apts.*, 528 N.E.2d at 866; *Meridian Hills Country Club*, 512 N.E.2d at 915; *Anaconda*, 94 N.M. at 207, 608 P.2d at 519. As we noted above, Mr. Hasti's calculations appear to indicate that in 1988 the economic obsolescence factor was 59%; *i.e.*, only 41% of the crushing capacity was utilized. However, Mr. Hasti also added the following note:

"* * * Production was down in 1988 compared to 1987 in spite of an increase in the number of acres planted. The cause of the decrease may be attributed to the dry weather conditions for the 1988 crop year."

We do not believe that dry weather conditions during one growing season constitute incurable or permanent impairment of the useful life of the plant. Therefore, Mr. Hasti did not act arbitrarily by not basing his calculation of economic obsolescence on the 1988 growing season.

■ Our second question concerning Mr. Hasti's appraisal is how the unprofitability of the current operations affects the calculation of economic obsolescence. Although it may be considered as a factor in determining the amount of obsolescence, unprofitability absent an impairment of useful life is not sufficient to establish economic obsolescence. In this respect, the Ninth Circuit Court of Appeals has said:

"[I]t is clear that useful life should not be revised to reflect competitive failure of the venture in which the asset is used, to which it is perhaps uniquely adapted, but for whose failure in the market place its condition and design are blameless. The deduction is not intended to bail out business efforts that fail in the market place. Thus, the unprofitability of an asset is insufficient to establish obsolescence. *Detroit & Windsor Ferry Co. v. Woodworth*, 115 F.2d 795 (6th Cir. 1940); *State Line & Sullivan R. Co. v. Phillips*, 98 F.2d 651 (3d Cir.), Cert. denied, 305 U.S. 635, 59 S.Ct. 103, 83 L.Ed.

408 (1938); *Zimmerman, supra*, 67 T.C. [94] at 107." [ (1976) ]

*Ames*, 626 F.2d at 697. Similar reasoning has also been expressed by the Kansas Supreme Court:

"' ... It thus becomes apparent that while the rental value of the property fluctuated, its life is in no wise diminished, *and to grant taxpayer the relief it here seeks would be the equivalent of aiding it to recoup fluctuation losses.* Manifestly, the life of the property has many years to run, and it can be used throughout its normal life. *The unprofitable nature of a business or the mere shrinkage in value of commodities is not a sufficient basis upon which to predicate an allowance for obsolescence....*' [Emphasis provided.]"

*Northern Natural Gas Co.*, 492 P.2d at 163 (quoting *Southeastern Bldg. Corp. v. Commissioner of Int. Rev.*, 148 F.2d 879, 880 (5th Cir.1945)). We agree that unprofitability, absent an impairment of useful life, does not establish economic obsolescence.

Mr. Hasti was correct in his determination that the year in which crop production declined as a result of temporary dry conditions should not form the basis for his calculation of economic obsolescence. Although the supply of sunflower seeds was reduced as a result of the dry conditions, the useful life of plant was not impaired by the temporary reduction in supply. We also agree that unprofitability that does not affect the useful life of an asset should not increase the level of economic obsolescence.

Midwest, through professional appraiser Andrew Runge, submitted evidence that Mr. Hasti had acted arbitrarily. During deposition testimony, Mr. Runge said that in his opinion Mr. Hasti's valuation of economic obsolescence was arbitrary. Mr. Runge testified that he believed the 35%

reduction or even the elimination of economic obsolescence. *See also, Ames v. C.I.R.*, 626 F.2d 693, 697 (9th Cir.1980). While this may seem contrary to what we have just noted concerning incurable permanent nature of obsolescence, it is not so when we consider that the initial

determination is based upon a reasonable belief that the economic obsolescence is incurable. The state appraiser has reasonably concluded that the plant's useful life has been incurably impaired by approximately 35%.

estimate of economic obsolescence was arrived at through a compromise in a similar case involving Cargill Plant, Riverside, North Dakota, where Mr. Hasti had determined economic obsolescence of 5% and Mr. Runge had estimated it to be closer to 55%. A compromise figure of 35% was agreed upon. In light of what we have previously said of Mr. Hasti's estimate, we cannot agree that the Board's acceptance of Hasti's estimate was arbitrary, capricious, or unreasonable.

Midwest also asks this Court to consider the decision of the District Court for the Southeast Judicial District in *National Sun Industries, Inc. v. Ransom County*, Civ. No. 90–054. Midwest contends that in *National Sun* the economic obsolescence factor was determined to be much higher. Midwest is bound on appeal to the record it made below. *See Evenson v. Hlebechuk*, 305 N.W.2d 13, 16 (N.D.1981). We therefore decline to consider the district court's decision in *National Sun*.

In summary, if, for the sake of argument only, we were to consider that Midwest has submitted an estimate of 67% or 68% economic obsolescence by reference to *National Sun*, the Board was presented with two conflicting estimates of economic obsolescence.

> "Our limited scope of review does not permit a court to weigh conflicting evidence to determine which version is more convincing. The Board, not a court, is responsible for weighing factual material for tax purposes."

*Koch*, 454 N.W.2d at 513. Issues of economic obsolescence involve elements of appraisal judgment which may result in differing results by reasonable appraisers. *See generally, Appeal of Colonial Pipeline Co.*, 347 S.E.2d at 389. The Supreme Court of Oregon recently described economic obsolescence as:

> " '[T]hat ghostly apparition, * * * [a] spirit whose presence may be discerned but whose intangible nature defies measurement, it confuses and chills the marketplace.' [Citation omitted.]"

*Truitt Bros., Inc.*, 732 P.2d at 502.

The Board made a determination that Mr. Hasti provided an accurate assessment of economic obsolescence rather than acting subjectively as Mr. Runge contended for Midwest. Having reviewed the findings of the Board in light of the record, we conclude that there is no basis for determining that the Board acted arbitrarily, capriciously, or unreasonably.

Midwest, in a footnote and in its statement of facts, contends that the Board's appraisal of the plant is arbitrary because it is 250% higher than the purchase price; we note that Midwest in its statement of facts claims the purchase price was 5.5 million but the applications for abatement state that the purchase price was $6,750,-000. Actually, the entire plant was built in 1980–1982 at a cost of approximately 58 million. Midwest's main thrust in this appeal is that the Board erred in deducting only 35% for economic obsolescence, but it buttresses its argument by saying that any appraisal that values the real property of the plant at 250% of the purchase price of the entire plant (including the real and personal property) must be arbitrary.

■ We have previously recognized that there are three methods of valuating real property: (1) comparable sales; (2) the cost approach; and (3) the income approach. *Ulvedal v. Board of County Commissioners*, 434 N.W.2d 707, 711, n. 3 (N.D.1989). Mr. Hasti used the cost approach in determining the value of the plant, and provided a detailed letter describing his determination.

■ Midwest appears to contend that an appraisal of 250% of the purchase price indicates arbitrariness in and of itself. We have previously said that a board is free to adopt the cost method of valuation. *Id.* at 711. As in *Ulvedal*, the Board had a range of values to consider and elected to rely upon Mr. Hasti's cost approach, which included his estimates of economic obsolescence, rather than Midwest's purchase price and its contended economic obsolescence based upon the findings of a trial court not before us. *Id.* In *Koch Hydrocarbon v. Bd. of Equalization*, 454 N.W.2d 508, 513 (N.D.1990), we recently said that a

board may even rely on hearsay for evidence of why the purchase price does not accurately reflect the true value of the property. In light of the fact that the Board relied upon an accepted method of valuating the plant, and Midwest offers no support for its position other than the general assertion that a valuation 250% above purchase price must be arbitrary, we cannot conclude that the Board's valuation, although significantly higher than purchase price, was arbitrary. As we said in *Ulvedal:*

"We can understand the taxpayers disappointment, but we are not convinced that the Board abused its authority by acting arbitrarily and unreasonably."

434 N.W.2d at 711.

### II. Standard of Review.

Midwest contends that because of the unique nature of the industry involved, we should apply a heightened scrutiny in our review of the Board's decision. The core of Midwest's argument for the application of heightened scrutiny is that although a Board of County Commissioners is well-suited for determining the value of farmland and local commercial properties, it lacks the requisite knowledge and skill necessary for valuing unique and complex industries. Midwest cites no authority for its proposition.

It is well established that our review of the decisions of local taxing authorities is limited, under the separation of powers, to determining whether or not the decisions are arbitrary, capricious, or unreasonable. *Koch Hydrocarbon v. Bd. of Equalization,* 454 N.W.2d 508 (N.D.1990); *Riverview Place, Inc. v. Cass County,* 448 N.W.2d 635 (N.D.1989); *Ulvedal v. Board of County Commissioners,* 434 N.W.2d 707 (N.D. 1989). We disagree with Midwest's contention that it is necessary to impose a "heightened" standard of review. In the case at bar, the Board took approximately nine months to determine the value of the plant. On several occasions the Board requested and received additional evidence and it made an on-site inspection of the plant. In our opinion the Board recognized its limitations and then proceeded to compensate for those limitations by receiving additional evidence. Applying a heightened scrutiny in cases such as this would not comport with our view of the need to recognize the division of powers between the legislative and the judicial branches of our government. We have previously noted:

"[T]hat the scope of judicial review of non-judicial decisionmaking is, under the separation of powers, limited to whether the decision is arbitrary, capricious, or unreasonable."

*Koch,* 454 N.W.2d at 511.

For the reasons stated above, the judgment is affirmed.

GIERKE and LEVINE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.

VANDE WALLE, Justice, concurring specially.

My concern with this case, which was not raised by the appellant nor answered by the majority opinion, relates to the relevance of the formula. As I understand the formula used, it totals the supply of sunflower seeds available in the State and divides that figure by the total available processing capacity in the State. The difference between that figure and one hundred percent is the "economic obsolescence" factor for a given year. Hypothetically, it would make no difference in the formula if the entire supply were all locked in one corner of the State and delivered to a plant in that corner. Each plant would be assigned a portion of the available supply, according to its processing capacity, whether or not there was any possibility that a portion of the supply would be delivered to that plant for processing. In fact, this plant operated only 290 days since it opened in 1982.

It is apparent that appraisal of property for tax purposes is far from an exact science but the method of appraisal should

bear some relationship to the realities of the situation. Further, once the figures used in the formula are adjusted by ignoring a low figure because of drought, the perception that the formula is subjective and result-oriented is made more acute. Drought in North Dakota in recent years may be more a reality than an aberration. But, I assume that an abnormally high production rate due to ideal weather and growing conditions, which rarely, if ever, exist, would also be ignored in the formula.

Nevertheless, I agree that there is sufficient evidence in the record to sustain the conclusion of the majority that the appraiser did not subjectively determine the amount of economic obsolescence by adopting an estimate arrived at through a compromise in a similar case, but, rather, used a facially objective formula. I therefore concur in the result reached by the majority opinion.