**NATIONAL SUN INDUSTRIES, INC., Appellee,**

v.

**RANSOM COUNTY, acting by and through the RANSOM COUNTY BOARD OF COMMISSIONERS, and the State of North Dakota, acting through its State Tax Commissioner, Heidi M.K. Heitkamp, Appellants.**

Civ. No. 910066.

Supreme Court of North Dakota.

Aug. 26, 1991.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for appellee; argued by Douglas R. Herman.

Robert W. Wirtz (argued), Asst. Atty. Gen., State Tax Dept., Bismarck, for appellants.

Wayne P. Jones, Lisbon, for appellants. No appearance.

MESCHKE, Justice.

We learn more about the industry-wide depression in processing sunflower oil seeds than was divulged to this court in *Midwest Processing Company v. McHenry County*, 467 N.W.2d 895 (N.D.1991). We conclude that the degree of economic obsolescence to adjust reproduction cost computations for determining the actual value of

a sunflower seed processing plant for property tax assessments cannot be arbitrarily measured by an opinion relying only on statistics of sunflower seed production and of processing capacity in North Dakota. We accordingly sustain, but modify, a district court judgment directing that the Ransom County Board reduce the assessments of the value of the processing plant owned by National Sun Industries, Inc. (NSI) at Enderlin, North Dakota.

Sunflower seeds come in two varieties, confection seeds and oil seeds. Confection seeds are used as nutmeats in edibles and in birdseed. Oil seeds are processed into oil and meal. Sunflower meal is used as a protein concentrate for livestock feed. Sunoil is refined and marketed worldwide for use as a cooking oil. This case is about valuing a plant that processes oil seeds.

In the United States during the 1970s, production of sunflower seeds boomed. From 85,000 metric tons in 1970, production increased to 3,310,000 metric tons in 1979. Between 1978 and 1982, the United States was the second largest producer of sunflower seeds in the world, behind only the Soviet Union. On the strength of this promising period, three new sunflower-crushing plants were planned and built in North Dakota, adding their productive capacity to two domestic plants in Minnesota.

The three new plants added processing capacity of over 1,200,000 metric tons per year to the industry's then capacity of over 800,000 metric tons, bringing total domestic capacity to more than 2,000,000 tons. The Cargill plant was completed at Riverside, North Dakota in 1982. The Midwest Processing plant was completed at Velva, North Dakota in 1983. NSI's plant at Enderlin was completed in late 1982 for a cost of over fifty million dollars. The Enderlin plant can crush and process 1,500 metric tons of sunflower seeds each day, converting them into 600 tons of oil, 600 tons of meal, and 300 tons of hulls. The hulls, in turn, are burned to generate steam and electricity, efficiently furnishing more than enough energy to operate the plant. The Enderlin plant can process 500,000 metric tons annually.

The domestic sunflower seed processing industry collapsed during the 1980s. Prices of sunflower products slumped. Companies were left with large inventories unsold, and farmers sharply decreased sunflower acreage. Domestic production progressively declined to about 800,000 metric tons in 1988. Meanwhile, world production expanded. By 1988 the United States production represented only 4 percent of world production, behind the Soviet Union, the European Community, Argentina, China, and Turkey. These devastating changes have resulted in a vast overcapacity in processing facilities in the United States, with over 2 million tons of capacity to process about 800,000 tons of sunflower seeds produced each year.

Domestic demand is low, too. Although sunoil is a major cooking oil in the world, it is not yet as popular in the United States. Sunoil competes with cooking oils from soybeans, cottonseed, corn, and tallow. Since 1979, imports of coconut, palm, and palm kernels for cooking oil uses have increased 67 percent to over 775,000 metric tons. Currently, sunoil represents only 3 percent of the United States market for cooking oils. The main demand for sunoil as a cooking oil is outside the United States, and most domestically produced crude sunoil is sold through commodity brokers, primarily for export markets already saturated.

The excess capacity in the United States and the changing world marketplace depressed the entire domestic sunflower seed processing industry. While the volume of sunflower seeds available for crushing within the United States has stabilized below 1 million metric tons because of low prices, the domestic processing capacity remains more than several times greater. Because of the brutal competition for seeds to crush, one of the older, Minnesota plants was closed, dismantled, and salvaged in 1990. While the total crushing capacity has thus been recently reduced nearly 20 percent, or about 400,000 metric tons, the quantity of sunflower seeds produced is still not nearly sufficient to supply the domestic crushing capacity, and there is insufficient demand to stimulate production.

The sunflower seed processing industry in the United States has been distressed for nearly a decade.

The history of the operations of the Enderlin plant reflects this distress of the entire industry. In 1985, less than 3 years after its completion, the plant was sold to new owners through a bankruptcy reorganization for $15,625,000, less than one-third of its cost. A few years later in 1987, a shareholder of 27½ percent agreed to turn back its shares for no cash consideration and release of most, but not all, of its liabilities. According to NDCC 57–02–27, "the price at which ... property would sell at auction, or at forced sale" cannot be a controlling criterion for assessment purposes, but events that show market conditions are factually relevant to actual value. The Enderlin plant has had only one year of operating profits, has averaged a net operating loss over two million dollars per year, and has an accumulated retained earnings deficit over eight million dollars. The drastic impact of the industry-wide depression on the worth of the Enderlin plant is evident from this history.

For its first five years, the Enderlin plant operated free of property taxes under a new industry exemption. See NDCC 40–57.1–03. It was first assessed property taxes in 1988. After completion of the assessment and equalization process for 1988, the Enderlin plant was valued at $10,027,300, including land. See NDCC 57–02–01(15) and 57–02–27.1. After NSI's initial abatement application was denied, NSI paid the tax under protest and formally sought abatement and refund. When the Ransom County Board of Commissioners summarily denied any refund, NSI appealed to the district court. In 1989, the district court remanded under NDCC 28–34–01(3), directing the Ransom County Board to make a complete record of all the evidence material to the assessment.

Meanwhile, the Enderlin plant was valued at $11,350,800 for the 1989 assessment of property taxes. When the 1989 taxes came due, NSI also paid them under protest and filed for abatement and refund. For both 1988 and 1989, the protested portion was set aside in an interest-bearing account. See Ladish Malting Co. v. Stutsman County, 416 N.W.2d 31 (N.D.1987). The Ransom County Board held a combined hearing on the assessed values of the plant for both the 1988 and 1989 tax years.

Most of the equipment and machinery in the plant was exempt personal property and was not assessed. See Ladish Malting Co., 416 N.W.2d 31. During the hearing, there were some questions about classifying items of equipment between taxable property and exempt personal property. Except for a minor reduction of $13,000 for 3 tanks exempt as personal property, the Ransom County Board resolved all classification questions in favor of the initial assessments. There has been no appeal on classification questions, but only on the question of the degree of economic obsolescence to apply to reproduction cost computations to determine actual value.

The assessed value was derived from an appraisal by Barry Hasti, State Supervisor of Assessments in the office of the Tax Commissioner, who has statutory duties to assist local taxing authorities. See NDCC 57–01–05. Hasti used an adjusted reproduction cost approach to appraise the Enderlin plant, except for the land. See Ulvedal v. Board of County Commissioners, 434 N.W.2d 707 (N.D.1989). NSI and the taxing authorities largely agreed to the reproduction cost approach to appraise the plant, and they mainly disagreed about the degree of adjustment for economic obsolescence needed to determine the actual value.

Hasti's appraisal began with computing a reproduction cost of $19,301,138 for the taxable portion of the plant in 1988. He deducted $3,744,491 for physical depreciation. Hasti then further reduced the depreciated reproduction cost by 35 percent to adjust for economic obsolescence. Thus, the depreciated reproduction cost of $15,556,647 was reduced by $5,444,826 of economic obsolescence to appraise an adjusted value of $10,111,821. A few other decreases for exempt personal property and the addition of the land value arrived at a final assessment of $10,027,300.

NSI's expert, Michael Remsha, agreed with the reproduction cost approach but he would have reduced the depreciated reproduction cost by 70 percent to adjust for economic obsolescence. Remsha's calculation would have adjusted the depreciated reproduction cost of $15,556,647 by $10,889,652 for economic obsolescence to appraise an actual value of $4,666,995.

Hasti made a similar appraisal for 1989, adding to the estimated reproduction cost for some additions to the plant, and reducing the depreciated reproduction cost by a 35 percent factor for economic obsolescence, to appraise a value of $11,350,800 with the land. Again, NSI's expert would have reduced the depreciated reproduction cost by a 70 percent factor for economic obsolescence to appraise an actual value of $5,255,000 for 1989. The dispute over the degree of adjustment for economic obsolescence to arrive at actual value poses an assessment differential near $5,000,000 for each of the 1988 and 1989 tax years.

The Ransom County Board largely confirmed the assessed values based on Hasti's appraisals, concluding that "an economic [obsolescence] factor of 35% for real property is fair to all parties, and that it fairly represents economic obsolescence of the real property." NSI appealed to the district court, arguing that the adjustment of the reproduction cost for economic obsolescence was too little, arbitrary, and unreasonable.

The district court determined that "it is clear that economic obsolescence is causing losses to NSI in excess of $2 million per year" and concluded that "it is incomprehensible for the taxing authorities to allocate to NSI's real property a value in excess of $10 million." The district court ruled:

> There is no substantial evidence to support the finding of 35 percent economic obsolescence in the sunflower oil industry. All the evidence points to a degree of economic obsolescence far greater, i.e., 70 percent.

Thus, the district court gave no effect to Hasti's use of a 35 percent factor for economic obsolescence.

Rather, the district court determined, from evidence presented to, but ignored by, the Ransom County Board, that:

> All evidence suggests this [35 percent] figure originated with the Cargill plant at Riverside, Cass County. The Cargill plant was the first of the three North Dakota sunflower plants to be built and, accordingly, the first to be taxed. It is the *only* one of the three North Dakota plants to have avoided the bankruptcy court. It has flaxseed crushing capacity in addition to sunflower capacity. It is the only one of the three plants which generated any profit for its owner. Even so, the local and state taxing authorities originally allowed a 15 percent economic obsolescence for Cargill's initial property tax assessment.... On the basis of its own figures and an outside appraisal, Cargill applied for an abatement asking for a 55 percent economic obsolescence factor. During the abatement proceedings, the Cargill assessment was settled at a figure of 35 percent economic obsolescence. It is that 35 percent figure—generated strictly from Cargill's own experience at its Riverside plant—which now forms the so-called "industry standard" from which the taxing authorities will not deviate.
>
> ... Any application of the "adjusted" Cargill experience to the industry in general or to the NSI plant specifically is arbitrary.

Finding that "the entire business of the NSI plant is dependent upon the world economy in vegetable oils," the district court determined that Hasti's opinion of 35 percent economic obsolescence was unsupported, arbitrary, and, therefore, was not substantial evidence for the assessments by the Ransom County Board. The district court ordered that the adjustments to estimated reproduction costs for economic obsolescence be increased to 70 percent to reach actual values, and that the assessed values for 1988 and 1989 be decreased accordingly.

Ransom County and the State appeal, arguing that the Board did not act arbitrarily, capriciously, or unreasonably, and

that Hasti's opinion was substantial evidence for the assessments. During the appeal, this court decided the case of *Midwest Processing Company v. McHenry County*, 467 N.W.2d 895 (N.D.1991), holding that the McHenry County Board's assessment of the similar Velva sunflower-crushing plant, also using a Hasti appraisal, was not arbitrary, capricious, or unreasonable. In their reply brief to this court in this case, filed soon after the *Midwest* opinion, the taxing authorities urge that the *Midwest* decision is controlling. We think not.

This record and these arguments differ from the record and arguments in Midwest. Here, the taxing authorities fail to address the lack of any support for Hasti's opinion identified by NSI and by the district court. The taxing authorities do not respond to this deficiency resulting from Hasti's dependence on North Dakota statistics of production and of processing capacity for sunflower seeds, rather than reasons relevant to the entire domestic industry. Just as Midwest was "bound on appeal to the record it made below" in *Midwest*, 467 N.W.2d at 900, the taxing authorities are bound to the record that they have made for this appeal. From a record and arguments different than in *Midwest*, where "the relevance of the formula" was not raised (*see* Justice VandeWalle's concurrence, 467 N.W.2d at 901), we conclude that the degree of economic obsolescence in the sunflower seed crushing industry · cannot be arbitrarily measured by an opinion relying only on statistics of sunflower seed production and of processing capacity in North Dakota, rather than on reasons relevant to the entire industry.

■ Our standard of review is settled. Because of the separation of powers, neither the district court nor this court may reverse a local governing body's assessment of value for tax purposes simply because the reviewing court finds some of the evidence more convincing. *Ulvedal*, 434 N.W.2d at 708. "Only when there is such an absence of evidence or reason as to amount to arbitrary, capricious or unreasonable action, can a reviewing court re-

verse" the local governing body's assessment. *Id.* at 709. *See also Midwest*, 467 N.W.2d at 897. Because Hasti's opinion about economic obsolescence is arbitrary and unsupported, as the district court concluded, there is an absence of substantial evidence for the degree of economic obsolescence used by the Ransom County Board in adjusting reproduction cost computations to determine actual value. All of the evidence points to a substantially greater degree of economic obsolescence in the industry.

Hasti, the expert for the taxing authorities, and Remsha, the expert for NSI, agreed on the need to adjust any computation of reproduction cost for economic obsolescence in order to determine the actual value for the tax assessment. *See* NDCC 57-02-01(15). Hasti defined economic obsolescence as a "loss in value caused by forces outside of the property." Remsha said, "Economic Obsolescence is defined as the loss in value resulting from influences external to the property." These definitions conform to the one that this court approved in *Midwest*:

> The loss in usefulness of an asset, occasioned by the approach to the stage of economic uselessness through progress of the arts; economic inutility arising from external causes. Obsolescence refers to disappearing usefulness resulting from invention, change of style, legislation, or other causes having no physical relation to the object affected....

467 N.W.2d at 898 (emphasis and reference omitted). The overcapacity in the processing industry and the lack of demand for sunoil are external influences drastically decreasing the usefulness of processing plants.

Hasti's 1988 appraisal reported the total existing capacity of the five crushing plants in the United States at "about 2.2 million tons per year." He charted the annual tonnage of sunflower seeds crushed in "recent years:"

76–82.... 375,000 metric tons (annual average)
82–83.... 766,000 metric tons
83–84.... 590,000 metric tons

84–85.... 567,000 metric tons

85–86.... 674,000 metric tons

86–87.... 575,000 metric tons

Though Hasti did not say so, his summary of these industry-wide statistics suggests a "capacity utilization" trend averaging no better than thirty percent, or a reciprocal economic obsolescence up to seventy percent.

Hasti's report continued:

Because of the lack of demand for sunoil, there is an over abundance in crushing capacity. The crushing plant at Velva, ND is closed and the Honeymead facility at Fridley, MN is reported closed.

The [NSI] facility has a capacity to crush 547,500 tons of sunflower seeds per year. The lack of a market, competition from other crushing plants, and seeds available to crush has caused the plant to operate at less than optimum capacity. These factors are shown by the annual crush handled by the [NSI] facility: .

OILSEED CRUSHED—NSI

| Fiscal Year | Tons Crushed (000) | Percent of Capacity |
|---|---|---|
| 1983 | 140 | 25.5% |
| 1984 | 238 * | 34.8% |
| 1985 | 113 ** | 20.6% |
| 1986 | 352 | 64.3% |
| 1987 | 411 | 75.1% |

* Fifteen month year.

** Chapter 11 filed this year.

Abruptly, Hasti opines:

Based on the history of this plant and the over capacity of the sunflower crushing industry, the appraiser estimates that there is an economic obsolescence of thirty-five percent.

Unsupported by any industry-wide statistics, this opinion is arbitrary and insubstantial on the degree of economic obsolescence in the industry.

Still, the taxing authorities seek to shore up Hasti's opinion by reference to his letter to the McHenry County Board explaining how he arrived at 35 percent for the Midwest plant "using an accepted capacity utilization method." This explanation for McHenry County was made part of this record for the Ransom County Board. In it, Hasti charted North Dakota production for the period 1985–1988 as a ratio of North Dakota crushing capacity, ranging from a high of 73.4 percent in 1985 to a low of 41 percent during the drought year of 1988. Hasti then opined:

Given the decline in North Dakota production of sunflower seeds for oil, it seems reasonable that the processing plants will have seeds available to supply about 65% of the total North Dakota optimum crushing capacity. An indication of 35% economic obsolescence is apparent. (100% of capacity less 65% available seeds = 35% obsolescence).

Again, the relationship to the industry-wide experience is left unexplained.

The taxing authorities also quote Hasti's testimony in this record where he discussed this McHenry County analysis:

I compared the sunflower crushing facilities in North Dakota, the capacity of those, with the amount of sunflower oil production in North Dakota....

And on Page 3, I show the more recent years of the production of sunflowers to North Dakota as a percentage of crushing capacity of the North Dakota sunflower plants.

And looking at those figures, I came to the conclusion that the processing plants would have seeds available to them to supply approximately 65 percent of their questioned [sic] capacity which would indicate that there could be a 35 percent obsolescence factor.

Nowhere did Hasti explain how use of North Dakota statistics would fairly measure the degree of overcapacity in a national industry affected by worldwide economics of supply and demand.

 An opinion alone, unsupported by relevant reasons, is not substantial evidence.

[E]ven when the final [expert] opinion or inference is admitted, the inference amounts in force usually to nothing un-

less it appears to be solidly based on satisfactory data, the existence and quality of which we can always bring out, if desirable, on cross-examination.

7 Wigmore, Evidence § 1929, p. 39 (Chadbourn rev. 1978). *See Kaiser v. Kaiser*, 474 N.W.2d 63 (N.D.1991) (Granting a new trial for valuations based on an expert opinion for which "there is no explanation"); *Heggen v. Heggen*, 452 N.W.2d 96, 99 (N.D.1990) (An "opinion of value is insufficient to support a value determination by the factfinder if it is given without a valid basis or is based upon improper facts or analysis"). *See also Coronado Oil Co. v. Grieves*, 642 P.2d 423, 436 (Wyo.1982) ("The mere opinion of a witness unfortified by any data as to market value must be regarded as too uncertain and conjectural to form a proper basis for a reasonable estimation of value. The expert's opinion here was no more than an uninformed guess—a shot in the dark—a personal view"); 2 Am.Jur.2d *Administrative Law* § 395 (1962) ("[E]xpert evidence in the nature of conclusions may be of little weight unless supported by factual data"). Hasti's opinion here is based upon improper facts and analysis, using only North Dakota statistics to formulate an economic factor affected by industry-wide conditions. Hasti's arbitrary opinion is not substantial evidence.

In its brief, NSI addresses the assumption implicit in Hasti's opinion "that all sunflowers grown in North Dakota quickly make their way to the North Dakota oil crushing plants." NSI submits:

> First, the assumption ignores the "escape" of sunflowers (oil and confectionery) out of the State of North Dakota. A full 10 percent of the crop is crushed in other states.... Second, the assumption is that 100 percent of the crop (oil and confectionery) *immediately* goes to market, with none being held by growers or elevators in inventory and with none being held in anticipation of higher price. This is contrary to modern agricultural practices. Thus, if the implicit assump-

tion is corrected to conform with the evidence, and although a good portion of that seed eventually makes its way to the North Dakota oil crushing plants, it arrives over time as there is sufficient demand for the plants' oil product to produce an attractive price to farmers and elevators. Any "appraisal" which ignores industry trends, which overestimates the available crop and which makes invalid market assumptions is arbitrary, capricious and unreasonable.

[References to the record omitted]. We agree. These reasons are corroborated in this record and confirmed by the taxing authorities' complete failure to reply to them.

We conclude that the degree of economic obsolescence in a national industry cannot be arbitrarily measured by an opinion based on statistics of production and of processing capacity in North Dakota, rather than on reasons relevant to the entire industry. That does not mean, however, that the Ransom County Board must uncritically accept the opinion of Remsha, NSI's expert, that economic obsolescence is 70 percent. Remsha calculated and explained economic obsolescence several ways, ranging from 67 percent by a capacity utilization method to 99 percent by a plant-specific, income-shortfall method. There was other evidence before the Ransom County Board that would support a determination of a degree of economic obsolescence upward from 55 percent in a wide range. It is the Ransom County Board, not the district court, that should make this determination from the substantial evidence in this record.

We hold that Hasti's opinion adjusting reproduction costs by an economic obsolescence factor of 35 percent is unsupported and insubstantial, and that the Board's determination of actual value based on it is arbitrary and unreasonable. Therefore, we sustain the district court's judgment that there is no substantial evidence to support the assessment. However, we modify the district court's order

by deleting the direction to the Ransom County Board that the economic obsolescence factor be increased to 70 percent. Instead, we remand with the direction that the Ransom County Board properly determine the degree of economic obsolescence in the industry.

We modify and remand accordingly.

ERICKSTAD, C.J., GIERKE and VANDE WALLE, JJ., and DOUGLAS B. HEEN, Surrogate Judge, concur.

DOUGLAS B. HEEN, Surrogate Judge, sitting in place of LEVINE, J., disqualified.